**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 06-1708 (CKK) |
| | ) |
| **DEPARTMENT OF JUSTICE,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR AN OPEN AMERICA STAY**

Defendant Department of Justice ("DOJ") has moved for entry of an order to stay the processing of a Freedom of Information Act ("FOIA") request Plaintiff Electronic Frontier Foundation ("EFF" or "Plaintiff") submitted in August 2006 to Defendant's component, the Federal Bureau of Investigation ("FBI"), for records related to electronic surveillance tools known as DCS-3000 and Red Hook. Defendant does not dispute that Plaintiff's request is legally entitled to processing under the FOIA and the agency's regulations. Now, however, more than seven (7) months after Plaintiff submitted its request, the DOJ not only has failed to complete its processing, but asks that it be permitted an *additional twenty-seven (27) months* to do so.

Defendant has failed to make the showing necessary for the Court to permit it such an extensive amount of time to process Plaintiff's FOIA request. For this reason, the Court should deny the DOJ's motion, and order the FBI to complete the processing of Plaintiff's request within sixty (60) days. Should the Court grant the FBI a longer period of time to process EFF's request, EFF respectfully asks that the Court order Defendant to make interim releases of material responsive to EFF's request every four (4) weeks, and

submit periodic reports to the Court on the Bureau's progress toward completion of the

processing of Plaintiff's FOIA request.

## STATEMENT OF FACTS

**I.      The Carnivore Internet Monitoring System and the
         New Generation of Electronic Surveillance Tools**

On July 11, 2000, the Wall Street Journal reported that the FBI had deployed a

surveillance system known as "Carnivore," which monitored traffic at Internet service

provider facilities to intercept information in the electronic mail of criminal suspects.

Neil King Jr. and Ted Bridis, FBI's Wiretaps To Scan E-Mail Spark Concern, *Wall Street

Journal*, July 11, 2000 at A3.  The Journal reported that Carnivore "can scan millions of

e-mails a second" and "would give the government, at least theoretically, the ability to

eavesdrop on all customers' digital communications, from e-mail to online banking and

Web surfing." *Id*.  This system, later renamed DCS-1000, raised substantial concerns on

the part of Congress, privacy and security experts, and the general public about the

potential overcollection of personal information in the course of FBI surveillance. *See,

e.g.*, John Schwartz, FBI Internet Wiretaps Raise Issues of Privacy, *Washington Post*,

July 12, 2000 at E01; Del Quinten Wilber, FBI Taps of E-Mail Provoke Concerns,

*Baltimore Sun*, July 24, 2000 at A1; Jacqueline Newmyer, FBI's Carnivore E-Mail Tool

Chewed Up by Lawmakers, *Los Angeles Times*, July 25, 2000, at A5; Ted Bridis,

Congressional Panel Debates Carnivore as FBI Moves to Mollify Privacy Concerns, *Wall

Street Journal*, July 25, 2000 at A24; Lou Dolinar, FBI Software That Peeks at E-Mail is

Causing a Stir, *Newsday*, July 30, 2000 at A08; David A. Vise and Dan Eggen, Study:

FBI Tool Needs Honing, *Washington Post*, Nov. 22, 2000, at A02; Evidence of FBI

Evasions Feeds Carnivore Doubts, *USA Today*, Nov. 30, 2000 at 16A; John Schwartz,

Computer Security Experts Question Internet Wiretaps, *NY Times*, Dec. 5, 2000, at A16.

Documents subsequently released under the FOIA played a significant role in

educating the public and decisionmakers about the scope, technical details, and

capabilities of Carnivore.  *See* Carnivore FOIA Documents, Electronic Privacy

Information Center, http://www.epic.org/privacy/carnivore/foia_documents.html (last

visited March 12, 2007); *see also* Dan Eggen, More Questions Surface About FBI

Software, *Washington Post*, Nov. 18, 2000 at A03; John Schwartz, Wiretapping System

Works on Internet, Review Finds, *NY Times*, Nov. 22, 2000 at A19; Dan Eggen,

'Carnivore' Glitches Blamed for FBI Woes, *Washington Post*, May 29, 2002 at A07;

John Schwartz, Bin Laden Inquiry was Hindered by F.B.I. E-Mail Tapping, *NY Times*,

May 29, 2002 at A16.

In response to concerns about Carnivore's invasiveness, Congress required the

Attorney General to submit reports on the use of the surveillance tool in fiscal years 2002

and 2003 to members of the Committees on the Judiciary of the Senate and House of

Representatives.  Pub. L. 107-273 (2002).  These reports to Congress, also disclosed

under the FOIA, revealed that the Bureau did not use DCS-1000 to conduct Internet

surveillance during that period.  FBI Reports to Congress on Use of Carnivore/DCS

1000, Electronic Privacy Information Center, http://www.epic.org/privacy/carnivore

/2002_report.pdf & http://www.epic.org/privacy/carnivore/2003_report.pdf (last visited

March 12, 2007).

In March 2006, the DOJ Office of the Inspector General issued a report on the

implementation of the Communications Assistance for Law Enforcement Act of 1994

("CALEA"), Pub. L. No. 103-414, 108 Stat. 4279, a law that imposes obligations upon

telecommunications carriers to help law enforcement carry out electronic surveillance.

U.S. Department of Justice Office of the Inspector General, Audit Report 06-13, The

Implementation of the of Communications Assistance for Law Enforcement Act, 107

(March 2006), http://www.usdoj.gov/oig/reports/FBIa0613/final.pdf.

   The report contained, *inter alia*, information about two electronic surveillance

systems that have been developed by the FBI:

> System DCS-3000. The FBI has spent nearly $10 million on this system.
> The FBI developed the system as an interim solution to intercept personal
> communications services delivered via emerging digital technologies used
> by wireless carriers in advance of any CALEA solutions being deployed.
> Law enforcement continues to utilize this technology as carriers continue
> to introduce new features and services.

<div align="center">*        *        *</div>

> Red Hook. The FBI has spent over $1.5 million to develop a system to
> collect voice and data calls and then process and display the intercepted
> information in the absence of a CALEA solution.

*Id.*

## II.    **Plaintiff's FOIA Request and the FBI's Response**

   By letter sent to the FBI via facsimile on August 11, 2006, Plaintiff requested

under the FOIA "all agency records (including, but not limited to, electronic records)

concerning electronic surveillance systems known as DCS-3000 and Red Hook."  Def.

Ex. A at 1.  In two separate letters dated August 22, 2006, the FBI acknowledged receipt

of Plaintiff's request to the Bureau.  Def. Ex. B.[1]  The FBI failed to disclose any records

---

[1] Defendant asserts that the FBI sent Plaintiff a letter dated August 30, 2006, stating that
the Bureau had found no records responsive to Plaintiff's request through a search of FBI
Headquarters' automated indices.  Def. Mot. at 9-10; Hardy Decl. ¶ 27; Def. Ex. C.
Plaintiff did not receive this letter via mail; however, Plaintiff does not dispute that the

responsive to Plaintiff's request within the 20-working-day time frame mandated by FOIA, and Plaintiff filed this suit on October 3, 2006. On February 9, 2007, the FBI moved for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C) and *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), seeking an additional twenty-seven (27) months to process Plaintiff's FOIA request.

## ARGUMENT

This issue raised in this motion is discrete and clear. Plaintiff submitted a FOIA request to the FBI more than seven (7) months ago seeking records about the Bureau's electronic monitoring technology, and the agency has failed to comply with the FOIA's mandated time frame for responding to a FOIA request. The agency's failure to complete the processing of Plaintiff's request constitutes a continuing impediment to Plaintiff's (and the public's) ability to examine the FBI's means of conducting electronic surveillance, which has been exceedingly controversial in recent years. The FBI now seeks more than two additional years to complete processing of the request. For the reasons discussed herein, this Court should deny Defendant's motion for a stay of proceedings and order the FBI to process Plaintiff's request within sixty (60) days.

---

letter was sent. In any event, the adequacy of the FBI's search is not at issue, since the FBI acknowledges that it subsequently located approximately 20,000 pages of potentially responsive material through additional inquiries to FBI Headquarters divisions. Def. Mot. at 10; Hardy Decl. ¶¶ 27-28.

**I.      Defendant Has Not Carried Its Burden of Showing
That It is Entitled to an *Open America* Stay By Offering
<u>Plaintiff an Opportunity to Narrow Its Request</u>**

As an initial matter, Defendant contends that Plaintiff "should not be allowed to

. . .  complain" that the FBI seeks twenty-seven (27) additional months to process

Plaintiff's FOIA request because Plaintiff has not reached an agreement with the FBI on

the narrowing of the request.  Defendant's Motion for an *Open America* Stay (hereafter

"Def. Mot.") at 22.  Defendant's argument is based on two conversations that counsel for

Plaintiff had with Mr. Loren Shaver, a representative of the FBI.  Declaration of Marcia

Hofmann (hereafter "Hofmann Decl.") ¶ 3 (attached hereto as Exhibit 1); Hardy Decl. ¶

28; Def. Exhibit D.  As Defendant notes, Mr. Shaver described to counsel "in very basic

terms[] the general types of records [the FBI] had identified and retrieved" in response to

Plaintiff's request, and asked whether Plaintiff would be willing to eliminate broad

categories of documents from the scope of the request. Def. Ex. D; Hofmann Decl. ¶ 6.

Mr. Shaver informed Plaintiff initially that the FBI had identified 14,000 pages

potentially responsive to Plaintiff's request, and later adjusted the number to 20,000

potentially responsive pages.  Hofmann Decl. ¶ 4.  He characterized the records in such

broad terms such as "e-mails," "conference papers," "procedure and policy write-ups,"

and "certification and accreditation data," among other categories.  Hofmann Decl. ¶ 5.

Plaintiff's counsel suggested that the parties seek to narrow or prioritize the request in

some manner other than by dismissing broad categories of documents from the scope of

the request. Hofmann Decl. ¶ 7.  Mr. Shaver said that other forms of narrowing would

require review of the documents and would be impracticable until a later date.  *Id*.

While Plaintiff declined the FBI's invitation to narrow its request, it did so

because the number of potentially responsive pages was so indefinite, and because

Plaintiff was unwilling to remove broad categories of documents from the scope of the

request without a better understanding of their content.[2]  Hofmann Decl. ¶ 8.  This

position was informed partly by counsel's prior dealings with the FBI in FOIA matters,

which have shown that an uncertain estimate of "potentially responsive" pages is likely to

change drastically once responsive material is actually reviewed. Hofmann Decl. ¶ 9.

　　　For example, in *Electronic Privacy Information Center v. Dep't of Justice*, Civ.

No. 05-845, 2005 U.S. Dist. LEXIS 40318 (D.D.C. Nov. 16, 2006) (attached hereto as

Exhibit 2), the FBI initially estimated that 130,000 pages of document were potentially

responsive to the plaintiff's request for records concerning the renewal of the USA

PATRIOT Act.  Hardy Decl. ¶ 20 (filed June 29, 2005) (attached hereto as Exhibit 3).

The estimate was uncertain because in that case the FBI had not yet located or reviewed

all potentially responsive documents to determine whether they were in fact responsive to

the plaintiff's request.  *Id.*  Ultimately, the FBI determined that only 18,000 pages

actually fell within the scope of the plaintiff's request — just 14% of the originally

estimated universe of documents.  Def.'s Response to Pl.'s Notice of Filing at 1 (filed

Nov. 14, 2005) (attached hereto as Exhibit 4).

　　　Plaintiff stresses that it remains open to discussing ways to narrow the scope of its

request or prioritize the release of material at issue once the amount and substance of the

responsive records are clearly defined.  Hofmann Decl. ¶ 10.  However, the purpose of

requesting this material would be defeated if Plaintiff blindly agreed to remove

---

[2] Indeed, Defendant concedes that it *still* has not determined how many documents are *actually* responsive to Plaintiff's request, and that processing analysts have not yet reviewed the documents.  Hardy Decl. ¶¶ 38-39.

potentially important records from the scope of the request without an informed

understanding of their content or even number.  Hofmann Decl. ¶ 11.

## II.    The DOJ has Failed to Show That it Should Be Permitted More Than Two Additional Years to Process EFF's Request

In support of its motion, the DOJ acknowledges that it is seeking a "lengthy stay"

of proceedings in which to process Plaintiff's request, but maintains that it is entitled to

more than two additional years pursuant to the FOIA and *Open America*, 547 F.2d at

615.  The legal standard that DOJ must satisfy to demonstrate an entitlement to a stay is

well established.  The "exceptional circumstances-due diligence" standard derives from

two sources: the FOIA itself, 5 U.S.C. § 552(a)(6)(C)(i)-(iii); and the D.C. Circuit's

opinion in *Open America*, 547 F. 2d 605, which construed the statutory provision.  This

Court recently recognized that:

> [u]nder D.C. Circuit law, a stay pursuant to [the statute] and the *Open America* doctrine may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows reasonable progress in reducing its backlog of requests."

*The Wilderness Society v. Dep't of the Interior*, No. 04-0650, 2005 U.S. Dist. LEXIS

20042, at **31-32 (D.D.C. Sept. 12, 2005) (citations omitted; emphasis in original)

(attached hereto as Exhibit 5).[3]  *See also Electronic Privacy Information Center v. Dep't*

---

[3] The court noted in *Wilderness Society* that

> [p]ursuant to the 1996 amendments, Congress *tightened the standard* for obtaining a stay by defining the term "exceptional circumstances" so as to exclude any "delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of requests."  5 U.S.C. § 552(a)(6)(C)(ii).

*of Justice*, No. 02-0063, 2005 U.S. Dist. LEXIS 18876, at **10-11 (D.D.C. Aug. 31 2005) (same) (attached hereto as Exhibit 6).  Under this standard, Defendant fails to show that it actually should be permitted such extensive time by the Court to process Plaintiff's request.[4]  Therefore, Defendant's motion should be denied.

### A.     The DOJ Has Failed to Demonstrate That Exceptional Circumstances Exist to Justify a Stay

In addition to its relatively large FOIA request backlog, Defendant claims that it has encountered three exceptional circumstances weighing in favor of a twenty-seven-month stay of proceedings.  First, the FBI has relocated its FOIA operations from Washington, DC to Frederick, Virginia, and has lost a number of FOIA staff as a result. Def. Mot. at 23-24; Hardy Decl. ¶¶ 11-14.  Second, the FBI cites four actual and potential federal district court deadlines, which Defendant claims are "taking resources away from other pending FOIA requests." Def. Mot. at 24; Hardy Decl. ¶¶ 15-20.  Finally, Defendant explains that a "high volume" of administrative appeals further exacerbates the FBI's FOIA backlog. Def. Mot. at 24; Hardy Decl. ¶ 20.  However, Defendant has failed to show that these events justify a twenty-seven-month stay of proceedings in this case.

First, this Court recently determined that an agency's other processing commitments and personnel difficulties are insufficient to justify an *Open America* stay. In *Leadership Conference on Civil Rights v. Gonzales*, the Department of Justice sought

---

*Id*. at *31 (emphasis added).

[4] As this Court has held, "Congress *imposed a burden* on agencies to account for any delay in the processing of standard FOIA requests[.]" *Electronic Privacy Information Center v. Dep't of Justice*, 416 F. Supp 2d 30, 39 n.8 (D.D.C. 2006) (emphasis added).

an additional forty-four (44) months to complete the processing of the plaintiff's six (6) FOIA requests. 404 F. Supp. 2d 246, 252 (D.D.C. 2005). In support of the motion, the government defendants cited circumstances similar to those in this case, such as a "large backlog of pending FOIA requests," including a number of requests "in the 'project' category which take a much longer time to process than other requests." *Id.* at 259. The defendants also argued, "the work of the [FOIA processing] unit has not only been disrupted by court orders requiring maximum manpower on an emergency basis to other litigation and cases but also personnel issues." *Id.* On these facts, the Court found that the Department failed to demonstrate that exceptional circumstances existed to justify an *Open America* stay, explaining:

> The Court is in no position to determine which "projects" warrant an emergency treatment and which "projects" do not. Furthermore, the Court will not get involved in defendants' personnel and project management difficulties. Therefore, defendants have shown the existence of a *predictable* backlog of FOIA requests. In addition, defendants have not convinced the Court that they are acting with due diligence to decrease their backlog. Accordingly, defendants motion for an *Open America* stay . . . is denied.

*Id.* (emphasis added).

Furthermore, there is little evidence that the litigation deadlines cited by Defendant will significantly affect the Bureau's ability to process Plaintiff's FOIA request in a timely manner. The FBI's court-imposed processing deadline in *Hidalgo v. FBI*, Civ. No. 06-1513 (D.D.C.) will have passed even before briefing is complete on Defendant's pending stay motion. Hardy Decl. ¶ 18. Furthermore, the Court has ordered the FBI to complete its processing of the documents at issue in *Gerstein v. CIA*, Civ. No. 06-4643 (N.D. Cal.) before the end of next month. Hardy Decl. ¶ 16. In a third case cited

by Defendant, *Vampire Nation v. Dep't of Justice*, Civ. No. 06-01950 (D.D.C.),

Defendant represents that it has not yet even moved for an *Open America* stay, and the

Court has not ordered the FBI to process any documents pursuant to a deadline. Hardy

Decl. ¶ 19. There is no indication that these cases should significantly affect Defendant's

capability to process Plaintiff's request, and their mere existence does not justify the stay

Defendant requests.

Finally, the FBI's claim that a high volume of administrative appeals constitutes

an exceptional circumstance is unavailing. According to Defendant, the Bureau received

1015 administrative appeals in 2006. Def. Mot. at 24; Hardy Decl. ¶ 20. As of January

31, 2007, 525 administrative appeals were pending resolution. Def. Mot. at 24; Hardy

Decl. ¶ 20. As the FBI concedes, "this number does not represent an increase," but

"remains a significant drain on resources." Def. Mot. at 24; Hardy Decl. ¶ 20. The FBI

presents no evidence that these administrative appeals are anything more than part of the

Bureau's predictable FOIA backlog, nor that the agency is taking steps to reduce the

number of administrative appeals pending resolution. Thus, the appeals cannot be

considered an exceptional circumstance weighing in favor of a stay.

Therefore, regardless of how difficult or time-consuming the processing of

Plaintiff's FOIA request may be when facing a large FOIA request backlog, litigation

deadlines and personnel difficulties, Defendant has failed to cite exceptional

circumstances sufficient to satisfy the well-established *Open America* standard as

construed in this Circuit.

**B.   DOJ has not Exercised "Due Diligence" in
Its Processing of Plaintiff's FOIA Request**

DOJ has also failed to satisfy the "due diligence" prong of the standard.  The D.C.

Circuit has recognized that the FOIA's legislative history requires an agency to have

exercised "due diligence" *from the outset* in order to qualify for the kind of relief DOJ

seeks here.  *Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 n.3 (D.C. Cir. 1990) ("The

court [has] authority to allow the agency additional time to examine requested records in

exceptional circumstances where the agency was exercising due diligence in responding to

the request *and had been since the request was received*.") (quoting H.R. Conf. Rep. No.

1380, 93d Cong., 2d Sess. 11 (1974)) (emphasis added).

The record clearly establishes that the Bureau has not even approached the

requisite showing in its handling of Plaintiff's request to date.  EFF's request was

submitted to the FBI on August 11, 2007. Def. Ex. A.  Since then, the DOJ has located

more than 20,000 "potentially responsive documents," Hardy Decl. ¶ 38, but has not yet

even assigned them to a FOIA/Privacy Act processing analyst for review. Hardy Decl. ¶

39.

It is thus clear that Defendant DOJ has, to date, failed to exercise "due diligence"

in its handling of material responsive to this FOIA request.  By no stretch of the

imagination can DOJ's response be deemed diligent "since the request was received,"

*Oglesby*, where it has taken more than *seven (7) months* to merely collect documents that

*may* be responsive to Plaintiff's request.  Notwithstanding any representations that might

be made in the government's submissions, it is beyond dispute that Defendant DOJ has

failed to meet its burden of satisfying the "exceptional circumstances-due diligence" test.

Thus, the Court should not permit Defendant an additional twenty-seven months to process EFF's request, but should order the FBI to process and release non-exempt material responsive to EFF's request within sixty (60) days.

### III.    Courts Routinely Order Agencies to Process Documents Pursuant to FOIA Requests

The approach that Plaintiff suggests is not unusual. This Court has recently imposed specific processing deadlines on agencies, requiring the prompt delivery of non-exempt records to FOIA requesters. For example, in *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138 (D.D.C. 2002), the Court ordered the Commerce Department and the Transportation Department to process, respectively, 9000 and 6000 pages of material; to complete the processing within sixty (60) days; and to provide the requester with a *Vaughn* index within seventy-two (72) days. *Id.* at 141. It is worth noting that the requesters of the FOIA requests at issue in that case did *not* claim to be entitled to expedited processing.

Similarly, in *Natural Resources Defense Council v. Dep't of Energy* ("*NRDC*"), the Court ordered the Energy Department to process 7500 pages of material; to complete the processing of the "vast majority" of the material within thirty-two (32) days; to complete all processing within forty-eight (48) days; and to provide the requester with a *Vaughn* index within sixty-three (63) days. 191 F. Supp. 2d 41, 43-44 (D.D.C. 2002). Again, the FOIA request in *NRDC* had *not* been granted expedited treatment.

For these reasons, the Court should not only deny Defendant's motion for an *Open America* stay, but also order the FBI to complete processing of Plaintiff's request

within sixty (60) days.[5]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion for entry of an *Open America* stay, and require Defendant DOJ and its component the FBI to process Plaintiff's FOIA request for records concerning the FBI's electronic surveillance efforts within sixty (60) days of the Court's order. Should the Court grant the FBI a longer period of time to process EFF's request, Plaintiff respectfully asks that the Court order Defendant to make interim releases of documents responsive to Plaintiff's request every four (4) weeks, and submit periodic reports to the Court on the Bureau's progress toward completing the processing of Plaintiff's FOIA request.

Respectfully submitted,

/s/ *Marcia Hofmann*
MARCIA HOFMANN
D.C. Bar No. 484136

DAVID L. SOBEL
D.C. Bar No. 360418

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue NW
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

---

[5] If, however, the Court should permit the FBI a longer period of time to process Plaintiff's request, it should order the FBI to make interim releases of responsive material every four (4) weeks, as well as require the Bureau to periodically report to the Court on its progress toward competing the processing of the request. Defendant has already indicated its willingness to process about 800 pages approximately every four (4) weeks, once Plaintiff's request has been assigned to a FOIPA Disclosure Unit. Def. Mot. at 11; Hardy Decl. ¶ 39.

# Exhibit 1

*Electronic Frontier Foundation v. Department of Justice*, No. 06-1708 (CKK)

Plaintiff's Opposition to Defendant's Motion for an *Open America* Stay

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-1708 (CKK) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF MARCIA HOFMANN

I, MARCIA HOFMANN, do hereby depose and state:

1. I am counsel for the Plaintiff Electronic Frontier Foundation ("EFF" or "Plaintiff") in the above-captioned action.

2. Plaintiff Electronic Frontier Foundation ("EFF") is a not-for-profit corporation established under the laws of the State of California, with offices in San Francisco, California and Washington, DC. EFF is a donor-supported membership organization that works to inform policymakers and the general public about civil liberties issues related to technology, and to act as a defender of those liberties. In support of its mission, EFF uses the Freedom of Information Act ("FOIA") to obtain and disseminate information concerning the activities of federal agencies.

3. On December 16, 2006, and January 9, 2007, I spoke by telephone to Mr. Loren Shaver, an FBI representative, about narrowing the scope of the FOIA request EFF had submitted to the FBI on August 11, 2006, for records concerning the electronic surveillance tools known as DCS-3000 and Red Hook.

4. Mr. Shaver explained initially that the FBI had identified 14,000 pages potentially

responsive to EFF's request.  He later adjusted the number to 20,000 potentially responsive pages.

5.  Mr. Shaver characterized the records in broad terms such as "e-mails," "conference papers," "procedure and policy write-ups," and "certification and accreditation data," among other categories.

6.  Mr. Shaver asked whether EFF would be willing to narrow its August 11, 2006 request by removing any of the specified categories of documents from the scope of the request.

7.  I suggested that the parties seek to narrow or prioritize the request in some manner other than by dismissing broad categories of documents from the scope of the request.  Mr. Shaver said that other forms of narrowing would require review of the documents, and would be impracticable until a later date.

8.  I declined the FBI's invitation to narrow EFF's request because the number of potentially responsive pages was so indefinite, and because I was unwilling to remove broad categories of documents from the scope of the request without a better understanding of their content.

9.  Plaintiff's decision not to narrow the scope of the request was informed partly by my prior dealings with the FBI in FOIA matters, which have shown that an uncertain estimate of "potentially responsive" pages is likely to change drastically once the pages are reviewed.

10.  Plaintiff remains open to discussing ways to narrow the scope or prioritize the release of material at issue once the amount and substance of the responsive records are clearly defined.

11.  The purpose of Plaintiff's FOIA request would be defeated if Plaintiff blindly agreed to remove potentially important records from the scope of the request without an informed understanding of their content or even number.

2

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge and belief.

3/14/06
DATE

MARCIA HOFMANN

# Exhibit 2

*Electronic Frontier Foundation v. Department of Justice*, No. 06-1708 (CKK)

Plaintiff's Opposition to Defendant's Motion for an *Open America* Stay

**ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff, v. DEPARTMENT OF JUSTICE, Defendant.**

**Civil Action No. 05-845 (GK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2005 U.S. Dist. LEXIS 40318**

**November 16, 2005, Decided**
**November 16, 2005, Filed**

**COUNSEL:** [*1] For ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff: Marcia Clare Hofmann, David L. Sobel, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, DC.

For DEPARTMENT OF JUSTICE, Defendant: Marcia Kay Sowles, U.S. DEPARTMENT OF JUSTICE, Washington, DC; Benton Gregory Peterson, ASSISTANT UNITED STATES ATTORNEY, Civil Division, Washington, DC.

**JUDGES:** Gladys Kessler, United States District Judge.

**OPINION BY:** Gladys Kessler

**OPINION:**

### MEMORANDUM ORDER

Plaintiff is a public interest research organization which, among other things, reviews federal law enforcement activities and policies to determine their potential impact on privacy interests and civil liberties. On March 29, 2005, Plaintiff filed a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. ß 552, for the release of various information related to the "USA PATRIOT ACT of 2001," Pub. L. No. 107-56, 115 Stat. 272 (2001). Compl. P 8. Plaintiff sought expedited processing of its FOIA request. Id. P 9.

By letter dated April 12, 2005, the Federal Bureau of Investigation ("FBI"), a component of Defendant, granted Plaintiff's request for expedited processing. Pl's Mot. to Compel, Ex. 3. Thereafter, Plaintiff [*2] filed this lawsuit claiming Defendant failed to process Plaintiff's FOIA request in a timely manner. On June 14, 2005, Plaintiff filed a Motion to Compel Expedited Processing of Plaintiff's FOIA Request ("Plaintiff's Motion").

On November 8, 2005, a Status Conference was held, during which the parties reiterated their positions with respect to the processing of Plaintiff's FOIA request.

That same day, the Court granted Plaintiff's Motion, and ordered the parties to submit a Joint Praecipe with a proposed timeline for processing the remaining pages, or notify the Court that they were unable to come to an agreement. The parties were informed that if they were unable to come to an agreement, the Court would enter an order based on the record before it. On November 14, 2005, the parties informed the Court that they were unable to reach an agreement regarding the remaining pages.

The Court is unable to determine, based on the Government's representations at the Status Conference and various written submissions made during this litigation, how many pages it can actually process within a given time frame. At the Status Conference, the Government represented that the universe of potentially [*3] responsive pages had been narrowed from approximately 130,000 to 18,000. As early as June 29, 2005, the Government had already determined that 5,000 pages of the 18,000 were potentially responsive. Def.'s Opp'n to Pl.'s Mot. to Compel, Att. A P 20. Yet the Government has not stated that any of those 5,000 pages have been completely processed, n1 nor that any of those pages have been turned over to Plaintiff.

> n1 The Government represents that "because of the nature of plaintiff's request, identification of responsive records has proven much more difficult than initially anticipated." Def.'s Resp. to Pl.'s Notice of Filing at 1.

To provide another example of the inadequacy of the Government's responses to Plaintiff's Motion, it filed, in support of its Opposition to Plaintiff's Motion, the Declaration of David M. Hardy, Section Chief of the Record/Information Dissemination Section, Records Management Division, FBI Headquarters. Hardy attested that the FBI should be able to process 1,000 pages per month

2005 U.S. Dist. LEXIS 40318, *

for responsiveness. [*4] Opp'n, Att. A P 26. However, at the Status Conference, almost seven months after the FBI agreed to process Plaintiff's FOIA request on an expedited basis, the Government was still unable to give even an estimate as to how far along in the review process it was. Nor could the Government provide an estimate as to when processing would be completed.

What is clear is that Plaintiff's FOIA request, which should have been processed on an expedited basis, has been pending for nearly eight months. An incredibly small amount of pages has been released to Plaintiff. n2 While the Court recognizes the difficulty the Government has had in processing Plaintiff's request, the record shows that Defendant's efforts have been unnecessarily slow and inefficient.

> n2 The Government represented at the Status Conference that only about 250 pages had been released to Plaintiff.

Upon consideration of the Motion, Opposition, and Reply, the representations made during the Status Conference, the parties' submissions in response to the [*5] Court's November 8, 2005 Order, and the entire record herein, it is hereby

**ORDERED** that Defendant shall complete the processing of 1500 pages every 15 calendar days, and pro-

vide to Plaintiff all responsive non-exempt pages contained therein, until processing is complete; n3 it is further

> n3 The Court recognizes that there are several layers of review, each of which take time. However, the Government has represented that it is processing Plaintiff's FOIA request on a rolling basis, i.e., after a group of documents are reviewed for responsiveness, they are immediately moved to the next stage of review. Therefore, at this point, there should be a number of documents at various stages of the review process, and Defendant should be able to comply with this Order without the need for an initial grace period.

**ORDERED** that Defendant shall notify Plaintiff of the total number of pages responsive to Plaintiff's FOIA request within 60 calendar days; and it is further

**ORDERED** that Defendant is not [*6] required to categorize responsive documents according to Plaintiff's different FOIA requests.

Gladys Kessler

United States District Judge

November 16, 2005

# Exhibit 3

*Electronic Frontier Foundation v. Department of Justice*, No. 06-1708 (CKK)

Plaintiff's Opposition to Defendant's Motion for an *Open America* Stay

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.  05-CV-845 (GK) ECF |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendant. ) | |

### DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since August 1,

2002.  Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the

Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had

direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals,

and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy

Judge Advocate at various commands and routinely worked with FOIA matters.  I am

also an attorney and have been licensed to practice law in the State of Texas since

1980.

(2)    In my current capacity as Section Chief, I supervise the Freedom of

Information/Privacy Acts ("FOIPA") Litigation Support Unit ("LSU"). The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded plaintiff's FOIA request to FBIHQ for the expedited release of agency records related to the FBI's use of certain provisions of the USA PATRIOT Act.

(4)     The purpose of this declaration is to provide the Court and plaintiff with an explanation of the FBI's record-keeping system, FBI FOIA processing procedures, the FBI's efforts to expedite plaintiff's request, and to respond to the arguments raised by plaintiff in *Plaintiff's Motion to Compel Expedited Processing of Plaintiff's Freedom of Information Act Request.*

<div align="center">**OVERVIEW OF FBI'S FOIA PROCEDURE**</div>

A. **HOW A FOIA REQUEST IS PROCESSED IN RIDS**

(5)     Over the years, the FOIA Section at FBIHQ has engaged in a continuing effort to improve its procedures in order to better serve the needs of requesters who seek information from the FBI. In 2002, reorganization of various divisions at FBIHQ resulted in the formation of the RMD, which now handles all FOIA and Privacy Act

<div align="center">–2–</div>

requests through RIDS. These most recent efforts have resulted in the following organizational plan which will be discussed in more detail below.

(6)    The mission of RIDS is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information. RIDS is responsible for providing program and policy management pertaining to the researching, reviewing, analyzing, processing, and classification/declassification work relating to FOIA and Privacy Act, Executive Order 12958, as amended, Presidential, Attorney General, and FBI policies and procedures, judicial decisions, and other Presidential and Congressional directives. RIDS also provides prepublication review of material written by current and/or former FBI employees concerning FBI matters as mandated by the FBI's employment agreement. RIDS currently employs 247 employees, most of whom are Legal Administrative Specialists ("LASs"), and who are assigned among the ten (10) Units within RIDS, whose shared function is to intake, review, process, and release information in response to FOIA and Privacy Act requests. To accomplish this mission, RIDS consists of the following ten Units: the Service Request Unit ("SRU"), two Work Process Units ("WPU"), three Classification Units ("CU"), three Freedom of Information and Privacy Acts ("FOIPA") Units ("Disclosure Units"), and the Litigation Support Unit ("LSU").

(a)    The **Service Request Unit** ("SRU") is responsible for reviewing and sorting all correspondence/incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies, and other FBI entities (i.e., FBI field offices, Legats). The SRU handles various initial tasks required to "perfect" a FOIA/Privacy Act request, including sending

–3–

letters to acknowledge requests, advising a requester to provide identifying data so that an accurate records search can be made and/or to submit a notarized signature/Privacy Act waiver, or advising a requester when no responsive records are located; opens new requests and assigns a FOIPA Request Number; and enters the perfected requests into the FOIPA Document Processing System ("FDPS") tracking system. The Negotiation Team, also a part of SRU, works with requesters whose requests generate a large volume of records in an attempt to narrow the scope of responsive records and facilitate a more rapid response. Finally, the Government Response Team ("GRT"), also a part of SRU, provides timely feedback to other federal agencies and other DOJ components with regard to referrals of documents – either sent for a consultation or for direct response to the requester – which are either FBI-originated or contain FBI-originated information.[1]

        (b)      The two **Work Process Units** ("WPUs") are responsible for preparing SRU's "perfected" requests for transfer to the three Disclosure Units. The WPUs conduct searches of the general indices for identifiable records, confirm responsive documents, stamp files for retention, forward files requiring classification review to the three Classification Units, address fee issues (other than fee waiver reviews), retrieve and forward files for scanning into FDPS, respond to status inquiries,

---

[1] The Government Response Team ("GRT") was formerly known as the "Government Response & Prepublication Review Unit." However, an internal reorganization recently resulted in shifting the GRT and its functions to the SRU, and shifting the Prepublication Review Team and its functions of prepublication review of all material written by current and/or former FBI employees concerning FBI matters as mandated by the FBI's employment agreement to the RIDS front office.

handle administrative appeals, and maintain requests prior to their in-turn transfer to the Disclosure Units.

(c)     The three **Classification Units** ("CUs") are responsible for complying with the classification/declassification review of FBI records under Executive Order 12958, as amended, and the July 1995 DOJ Memorandum of Understanding. The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, Office of Inspector General Reports, and other federal agency requests in order to determine whether such material should remain classified or be declassified.  In addition, the CUs review and prepare classified material for review by the Department of Justice Review Committee ("DRC").[2]

(d)     The three **FOIPA Units** ("Disclosure Units") perform the actual processing of all records pursuant to the provisions of the FOIA and Privacy Act. "Processing" involves a page-by-page, line-by-line review of the responsive documents to determine which, if any, FOIA and/or Privacy Act exemptions may apply.  This includes redaction of the exempt material and notation of the applicable exemption(s) in the margins of each page and/or preparation of deleted page information sheets when pages are withheld in their entireties (now done electronically in FDPS).  During the course of their review, the Disclosure Units consult with other government agencies for their determination as to the releasability of their information contained within FBI

---

[2]  The DRC is the FBI's appellate authority with regard to the implementation and administration of Executive Order 12958, as amended, and related directives and guidelines concerning classified information.  See 28 C.F.R. § 17.14 (2003).

-5-

records, or refer non-FBI documents to those originating agencies for processing and direct response. The Disclosure Units ensure that FOIA and/or Privacy Act exemptions have been applied properly, that no releasable material has been withheld, that no material meriting protection has been released, that all necessary classification reviews have been completed, and that other government agency information and/or entire documents originating with other government agencies have been properly handled.

(e)    The **Litigation Support Unit** ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel ("OGC") and Chief Division Counsels and Associate Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. The LSU coordinates the progress of the FBI's response to a particular FOIA/Privacy Act request as it progresses through the units described above, coordinates the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and the operational Divisions at FBIHQ, and coordinates the referral of documents to other DOJ components and government agencies. The LSU prepares the administrative record, drafts both procedural and substantive declarations and court pleadings, codes documents processed by the Disclosure Units, and drafts detailed declarations justifying the assertion of all applicable FOIA/Privacy Act exemptions.

(7)    After SRU and WPU perfect a request, the request is sent to the "perfected backlog." To ensure fairness to all requesters and to equitably administer the large numbers of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first in/first out" basis from within each of

-6-

three queues according to sound administrative practices.[3]  The FBI uses a three-queue system as a way to perfect and assign new requests.[4]  The three-queue system establishes a "multi-track" processing system for requests, based on the amount of time and work involved in handling a particular request.[5]  The system nevertheless preserves the principle that, within the three queues, requests are assigned and processed on a first-in/first out basis.  The placement of a request in one of the three queues depends on the total amount of material responsive to that request – 500 pages or less ("small queue"), 501 to 2,500 pages ("medium queue"), or more than 2,500 pages ("large queue"). This standard operating procedure, coupled with the FBI's "first in/first out" policy, permits requests to be addressed in the order in which they are received, while obviating the inequities to other requesters whose interests relate only to a small number of documents.  As described earlier, requesters whose requests have been placed in the large queue are given the opportunity, through contact with SRU's Negotiation Team, to reduce the scope of their requests and accelerate assignment of their requests by relocating them to a more advantageous queue.

(8)    LASs frequently work on more than one request at a time because it is not always administratively efficient to work only one request to completion before proceeding to the next.  Processing of a complex case may be halted midstream for a variety of reasons, such as resolving a classification issue, locating records that may be

---

[3]  See 28 C.F.R. § 16.5 (a) (2003).

[4]  This system went into effect on July 10, 1997, superseding the previous system of two queues (one for 100 pages or less, the other for requests greater than 100 pages).

[5]  See 5 U.S.C. § 552 (a) (6) (D) (I) and 28 C.F.R. § 16.5 (b) (2001).

missing, or consulting with other government agencies as to the nature and propriety of releasing certain information. In the interest of efficiency during this waiting period, other requests may be processed and released. Therefore, large requests are often processed in conjunction with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS resources.

(9)    Consistent with standard administrative procedure, any records referred to the FBI from other DOJ components in response to a particular request may be added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. By ensuring continuity in the processing of FOIA requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient, since the same issues presented by the referred records will already have been addressed by the LAS in processing the responsive FBI files.

-8-

B. **EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM**

(10)    The Central Records System ("CRS"), which is used to conduct searches in response to FOIA and Privacy Act requests, enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in this system are maintained at FBIHQ. Records that are pertinent to specific field offices are maintained in those field offices.

(11)    Access to the CRS is afforded by the General Indices, which are arranged in alphabetical order. The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices. The entries in the General Indices fall into two categories:

(a)  A "main" entry --- A "main" entry carries the name corresponding with a subject of a file contained in the CRS.

(b)  A "reference" entry — "Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, etc., contained in a document located in another "main" file.

(12)    Access to the CRS files at FBI field offices is also obtained by the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a

-9-

particular subject are made by searching the subject requested in the index. FBI field offices have automated indexing functions.

(13)    On or about October 16, 1995, the Automated Case Support ("ACS") was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ. More than 105 million records were converted from automated systems previously utilized by the FBI. ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a)    Investigative Case Management ("ICM") - ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other divisions, as needed, opens a case. The offices that receive leads are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number ("UCFN"), such as "29-NY-240102," which is used by all FBI offices, including FBIHQ, that are conducting or assisting in the investigation. The "29" indicates the type of investigation, "NY" indicates the Office of Origin of the investigation, in this example New York City, and "240102" denotes the individual case file number for that particular investigation.

(b)    Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All original serials are maintained in the OO case file.

–10–

(c)    Universal Index ("UNI") - UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases.  Only the OO is required to index; however, the LOs may index additional information as needed.  UNI, an 89.4 million record index, provides functions to index names to cases and to search names and cases for the FBI's investigative and administrative cases.  Names of individuals or non-individuals are recorded with identifying information, such as sex, race, event date, date or place of birth, locality, Social Security number or address.

(14)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBIHQ.  The FBI does not index every name in its files; rather, it indexes only that information considered pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this mass of information, information essential to ongoing investigations could not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to protect the Nation against terrorist attacks and investigate violations of federal criminal statutes.  Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

**PLAINTIFF'S FOIA REQUEST**

**A.  CORRESPONDENCE**

–11–

(15)    By letter dated March 29, 2005 to FBIHQ, plaintiff submitted an expedited

request under FOIA for the following records:

> 1) Any information concerning the FBI's use of authorities granted or
> expanded by Sections 201, 202, 203(b), 203(d), 204, 206, 207, 209, 212,
> 214, 217, 218, and 220 of the USA PATRIOT Act from October 26, 2001
> to the present.
>
> 2) Any information concerning the FBI's use of Section 215 of the USA
> PATRIOT Act from February 23, 2003 to the present.
>
> 3) Any information or communications concerning sunset of USA
> PATRIOT Act provisions.

Plaintiff further requested expedited processing, stating that the subject matter of the

request qualifies under the standard of an "urgency to inform the public about an actual

or alleged federal government activity" and the request is made by "a person primarily

engaged in disseminating information," citing 28 C.F.R.§ 16.5(d)(1)(ii). The purpose of

EPIC's request is to obtain information directly relevant to the upcoming decision by

Congress whether or not to renew these provisions at the end of the year. **(See Exhibit**

**1.)**

(16)    By letter dated March 30, 2005, FBIHQ acknowledged receipt of plaintiff's

request and advised that plaintiff's request was assigned Request Number 1017326-

000. **(See        Exhibit 2.)**

(17)    By letter dated April 12, 2005, plaintiff was advised that the FBI granted its

request for expedition pursuant to 28 C.F.R. § 16.5(d)(1)(ii). Plaintiff was advised that

its FOIA request would be assigned shortly and that a search would be conducted for

any potentially responsive records. Plaintiff was further advised that the FBI was in the

–12–

process of evaluating plaintiff's fee waiver request and that plaintiff would be notified in the near future regarding this decision. (**See** Exhibit 3.)

## B. SEARCHES FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(18)    One of the difficulties in identifying records responsive to plaintiff's FOIA request has been the generalized nature of the subject matter, i.e., "FBI's use of authorities granted or expanded by Sections 201, 202, 203(b), 203(d), 204, 206, 207, 209, 212, 214, 217, 218 and 220 of the USA PATRIOT ACT." These subject matters do not lend themselves to the search methods normally used by the FBI to locate records responsive to FOIA requests. In response to plaintiff's FOIA request, the FBI first initiated a search of the automated general indices to the CRS at FBIHQ to identify any records pertaining to the relevant provisions of the USA PATRIOT Act. The following phrases were searched through the CRS: "US Patriot Act," "Patriot Act," "USA Patriot Act" and "Sunset Provision." As a result of this search, file 66F-HQ-C1364260 was located and determined to be potentially responsive to plaintiff's request.

(19)    In addition, RMD, in coordination with OGC, sent an Electronic Communication ("EC") to all FBIHQ divisions in order to determine what, if any, records they possessed responsive to plaintiff's FOIA request. The contacted offices were asked if they possessed any records responsive to plaintiff's request, or if they have knowledge as to where responsive records may be located. Those individuals and offices most likely to possess responsive records have undertaken searches of their files, including, but not limited to, responsive e-mails. Based on this request, positive responses were received from the Inspection Division, Laboratory Division, Office of

–13–

Congressional Affairs, and OGC. As a result of these search efforts, a voluminous amount of potentially responsive records have been located.

(20)    The process of collecting potentially responsive documents, (as well as negative responses) is ongoing. To date, approximately 5,000 pages of documents have been identified as potentially responsive to plaintiff's request. The FBI has begun its review of those documents located thus far in order to determine whether they are in fact responsive. Additionally, we estimate that there are more than 130,000 pages of potentially responsive documents that are being examined to ensure that they are within the scope of plaintiff's broad request. However, at this time, because search efforts and scope review are ongoing, the FBI is unable to state with any finality the number of pages that will ultimately be deemed responsive to plaintiff's request. Large amounts of documents continue to be produced as responding Divisions within the FBI identify and copy pages.

(21)    Because this request asks for documents which relate to national security issues, we anticipate that many of the responsive documents will be classified in whole or in part and therefore must be reviewed by the RIDS' Classification Unit ("CU") in accordance with the guidelines and directives for classification pursuant to Executive Order 12958, as amended. In evaluating whether to classify a document, the CU LAS considers information including, but not limited to, whether the information is already in the public domain or likely to be known or suspected by present or potential adversaries of the United States; whether information can be attributed to an intelligence source; and whether the information generally can threaten the national security of our country.

<u>**EXPEDITED PROCESSING**</u>

--14--

(22)    The FBI recognizes the importance of responding quickly to this expedited request and has been working diligently toward that goal. Documents located during the search process are currently being reviewed for responsiveness and scanned into the FDPS tracking system for processing and release. Once remaining scanning is completed, the request will be considered "perfected."

(23)    Under normal circumstances the case is then sent to the "perfected backlog" to wait its turn. However, since this case has been granted expedition, the FBI plans to immediately assign it to an LAS for processing and release.

(24)    While an accurate page count does not yet exist, the FBI roughly estimates that as many as 130,000 pages may be responsive to EPIC's request for USA PATRIOT Act documents. This clearly places the case in the large queue. As of June 24, 2005, there were 33 cases in the large queue backlog. Of those 33 cases, 9 were opened in 2003; the oldest of those cases was opened on June 13, 2003. Thus, expedition of plaintiff's request will result in should result in a minimum savings of approximately 730 days, or more than two years.

(25)    Plaintiff notes that the FBI recently reported in its annual report to Congress for 2004 that the median time to process an expedited case was 41 days from the date of the request (date opened in the system) to the date the release was made (date closed in the system). In 2004, 35 cases were granted expedition. Of those 35 cases, 28 were requests from prisoners on death row who are automatically granted expedition, and the average number of responsive pages was 16. Of the remaining seven requests, the range of pages was zero (no responsive records) to 3703, while the range of days to process was one day (for the "no records" request) to

–15–

341 days for the 3703- page request. Since the number of responsive records for this request will far exceed that number given the number of potentially responsive records, the processing time will undoubtedly exceed the 341 days. If we assume that nearly all of the records identified so far as potentially responsive are in fact responsive, which given the plaintiff's broad request we anticipate will be true, that means we will have 130,000 pages. I must emphasize this is a preliminary estimate. (See infra for a discussion regarding the backlog and processing times).

(26)    The number of potentially responsive pages will likely exceed 130,000. Under current standards, an LAS should process 1,000 pages a month. By literally shutting down one of the three disclosure units – over which I have direct supervisory responsibility – of approximately 28 LASs each (two teams of 13 LASs per unit plus a team captain for each team, although vacancies exist) to work on this request alone, it would still take more than four months to process 130,000 pages. The four-month figure does not account for time required by the CU, legal review, and final review by the document owners/originators for accuracy prior to release. For classification review alone, it is estimated that a review of 1,000 pages would take three reviewers approximately one week to process. This also does not take into account referrals and consultations which may need to be made with other agencies or DOJ components.[6]

---

[6] During processing, if a document originating with another agency or DOJ component is located, or if information contained in an FBI document has originated with another agency or DOJ component, the FBI will refer that document and advise the requester that the referral was made. The other agency/DOJ component then determines the applicability, if any, of the FOIA exemptions and then responds directly to the requester. If we discover an FBI document with information provided by another agency, we would consult with that agency as to the applicability, if any, of FOIA exemptions to their information and we would either assert the applicable exemptions on their behalf

Moreover, because we anticipate that a significant portion of these documents will be classified, and/or contain material which is attorney/client, work product or deliberative process privileged, the actual amount of pages which will be released to plaintiff will be relatively small compared to the amount of pages withheld in full or in part. Thus, although an LAS may process 1,000 pages a month, the number of pages released will be significantly fewer. Let me once again emphasize that it is our belief that the 130,000-page count is a very conservative estimate. Should we be required to make additional shifts in personnel to comply with plaintiff's requested timetable, the effect would be devastating to the FBI's backlog of other cases.[7]

(27)    In addition, RIDS has taken all available steps to aid in the streamlining of the work and reduction of the FOIA/Privacy Act backlog. These include the use of direct on-line computer searches in order to locate responsive records, the use of forms which eliminate delays associated with word processing, the formation of specific teams to target backlog issues, the development of alternative methods to handle consultations with other government agencies, and the formation of the FOIPA LSU, which handles all FOIA/Privacy Act Litigation in RIDS.

---

or release the information.

[7] At this time, the FBI, through DOJ counsel, has been negotiating with plaintiff in order to reduce the scope of the request, and consequently the enormous impact the request in its current state would have on RIDS.

(28)   The FBI takes its responsibilities with regard to the administration of the

FOIA/Privacy Act program very seriously, and all reasonable efforts will be made to

continue to expedite plaintiff's request.

Pursuant to 28 U.S.C. § 1746, I declare the foregoing to be true and correct, and

that Exhibits 1 through 3 attached hereto are true and correct copies.

Executed this _29th_ day of June, 2005.

DAVID M. HARDY
Section Chief
Record/Information Dissemination
 Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

–18–

# Exhibit 4

*Electronic Frontier Foundation v. Department of Justice*, No. 06-1708 (CKK)

Plaintiff's Opposition to Defendant's Motion for an *Open America* Stay

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) ) ) | |
| Plaintiff | ) ) ) | Civil Action No. 1:05CV00845 (GK) |
| v. | ) ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S NOTICE OF FILING

Pursuant to this Court's order at the status conference on November 8, 2005, defendant attempted to reach an agreement with the plaintiff on a schedule for the processing of the remaining approximately 18,000 pages of potentially responsive documents to plaintiff's FOIA request. Unfortunately, defendant was not able to reach an agreement and hereby submits its alternative proposed order. See Attachment A. Defendant cannot agree to plaintiff's proposed order on two points.

1.      The rate of processing suggested by plaintiff in its proposed order – 3000 pages of responsive material (including both exempt and non-exempt material) every 15 days — is not reasonable. The standard for expedited processing set by FOIA is "as soon as practicable." 5 U.S.C. § 552(a)(6)(E). As defendant explained at the status conference, because of the nature of plaintiff's request, identification of responsive records has proven much more difficult than initially anticipated. While the FBI has completed the enormous task of narrowing the scope of potentially responsive pages of records from 130,000 to approximately 18,000 pages based on the time periods specified in plaintiff's FOIA request, attorneys familiar with the U.S. PATRIOT

Act provisions are still reviewing these 18,000 pages to determine which pages are actually responsive to plaintiff's request.

With enormous effort, FBI predicts that it could process approximately 3000 pages of records every 30 business days. To accomplish this rate, the FBI has assigned six attorneys (including a team leader) and three paralegals with expertise in the U.S. PATRIOT Act to review the records for responsiveness. In addition, the FBI has four paralegals plus a team leader working on a full-time basis to review the documents for exemptions. While the FBI predicted that an employee may be able to process approximately 1000 per month,[1] this does not mean that with four employees FBI can complete the processing of 4000 pages of records in one month. As Mr. Hardy explained in his declaration, this estimate did not include time required for classification review, legal review and final review by the document owners/originators for accuracy. Hardy Decl., ¶ 26. Because many of the records are classified, the FBI has assigned on a full-time basis four paralegals plus a team leader in its Declassification Review Unit to review these records. In addition, as Mr. Hardy explained in his declaration, once the documents have been reviewed for exemptions and declassification, the documents are subject to legal review to and final review by owners/originators for accuracy. This final review process adds additional time to the processing of the request.

2.    Plaintiff's proposed order requires FBI, within 45 days of the date of the order, to (a) make a final determination of the total number of pages of agency records responsive to plaintiff's request and (b) file with the Court a report "stating total number of pages responsive to each of the three categories of agency records identified in plaintiff's request." This demand

---

[1] Declaration of David M. Hardy, ¶ 26 (attached as Attachment 1 to Opposition to Plaintiff's Motion to Compel Expedited Processing of Plaintiff's Freedom of Information Act Request)

presents two problems.

a.    First, while the FBI is devoting a substantial amount of resources to its completion of the review of the records for responsiveness, 45 days is not sufficient.  FBI estimate that it will take 60 business days to complete the process of reviewing the 18,000 pages of potentially responsive records to determine the number of pages of responsive records.

b.    Second, plaintiff's demand that FBI specify the number of pages responsive to each of the three categories of plaintiff's request adds an unnecessary burden on the FBI and slows down the process.   It would require the FBI to re-review the records it has already determined to be responsive to determine which category or categories each record was responsive.  Therefore, defendant could not agree to this additional and unnecessary burden.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L WAINSTEIN.
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7108
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov
Attorneys for Defendant

# Exhibit 5

*Electronic Frontier Foundation v. Department of Justice*, No. 06-1708 (CKK)

Plaintiff's Opposition to Defendant's Motion for an *Open America* Stay

LEXSEE 2005 U.S. DIST. LEXIS 20042

**THE WILDERNESS SOCIETY, et al., Plaintiffs, v. UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Defendants.**

**Civil Action No. 04-0650 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2005 U.S. Dist. LEXIS 20042**

**September 12, 2005, Decided**

**COUNSEL:** [*1] For WILDERNESS SOCIETY, Plaintiff: James Stuart Angell, Edward B. Zukoski, EARTHJUSTICE, Denver, CO; Leslie L. Jones, THE WILDERNESS SOCIETY, Washington, DC.

For SOUTHERN UTAH WILDERNESS ALLIANCE, Plaintiff: James Stuart Angell, Edward B. Zukoski, EARTHJUSTICE, Denver, CO.

For UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, GALE NORTON, in her capacity as Secretary for the Interior of the United States, KATHLEEN CLARKE, in her capacity as Director of the Bureau of Land Management, ELAINE ZIELINSKI, in her capacity as Director of the Bureau of Land Management's Arizona Office, Defendants: Oliver W. McDaniel, U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA, CIVIL DIVISION, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

**MEMORANDUM OPINION**

Plaintiffs, The Wilderness Society and the Southern Utah Wilderness Alliance, brought this action for declaratory and injunctive relief against the United States Department of the Interior, Bureau of Land Management, and various members of the Department of the Interior ("the Department") in their official capacities for failure to produce records as [*2] requested pursuant to the Freedom of Information Act, 5 U.S.C. ß 552 ("FOIA"). Plaintiffs, non-profit environmental organizations that seek to protect America's wilderness and promote sensible land management, seek records held by the Depart-

ment that relate to the Department's passage of certain amendments to the "Disclaimer Rule" on January 6, 2003 -- a policy shift which enables states, counties, and interest groups to wrest title from the United States in order to build highway rights-of-way across federal lands pursuant to a Civil War-era law generally known as R.S. 2477. *See* 43 C.F.R. Part 1864, 68 Fed. Reg. 494-503 (Jan. 6, 2003); Act of July 26, 1866, ß 8, 14 Stat. 251, 253, formerly ß 2477 of the Revised Statutes, later 43 U.S.C. ß 932, *repealed by* Pub. L. No. 94-579, Title VII ß 706(a) (1976).

Currently before the Court are two motions: (1) Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay, to which Plaintiffs have filed an Opposition; and (2) Plaintiffs' Motion for Summary Judgment, to which Defendants have filed an Opposition, and Plaintiffs have filed a Reply [*3] and two Notices of Supplemental Authority. Upon a searching examination of the parties' motions, the attached exhibits, the relevant case law, and the entire record herein, the Court shall deny Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay, deny without prejudice Plaintiffs' Motion for Summary Judgment, and shall require the parties to file a Joint Status Report with this Court by September 28, 2005 setting out information as detailed in this Memorandum Opinion. *See infra* Section III(B).

**I: BACKGROUND**

Over the past two decades, the State of Utah and various counties within Utah -- as well as other counties and special interest groups across the West -- have declared their intention to claim thousands of highway rights-of-way across federal lands in order to promote transportation and development pursuant to a Civil War-era law known as R.S. 2477. Environmental groups have opposed these claims, arguing that they traverse some of the most scenic and environmentally sensitive public lands in the country, including proposed wilderness, fed-

Case 1:06-cv-01708-CKK    Document 12-6    Filed 03/14/2007    Page 3 of 11

Page 2
2005 U.S. Dist. LEXIS 20042, *

eral wilderness study areas, national parks, and national monuments. As Plaintiffs contend, [*4] "recognition of such rights-of-way could lead to the construction of ecologically destructive highways across these lands." Pls.' Mot. for Summ. J. at 5.

On January 6, 2003, the Department of the Interior passed several amendments to the so-called "Disclaimer Rule" in order to facilitate the ability of states, counties, and interest groups to wrest title from the United States of these claimed rights-of-way and spur development. *See* Pls.' 2nd Am. Compl. P 17 (citing 43 C.F.R. Part 1864, 68 Fed. Reg. 494-503 (Jan. 6, 2003)). The Disclaimer Rule implements a provision of the Federal Land Policy and Management Act ("FLPMA") that allows the federal government to disclaim its interest in lands. *Id.* P 18. Among other things, the 2003 revised rule allows states, counties, local governments, and special interest groups to obtain disclaimers regardless of whether they have ever been recognized as owners of record, which the Disclaimer Rule had previously required. *Id.* Moreover, the new rule also exempts states and local governments from the statute-of-limitations requirement that applies to all other property owners seeking a disclaimer, and allows the Department to [*5] recognize R.S. 2477 claims within national parks and wildlife refuges, even over the objections of the National Park Service or the U.S. Fish and Wildlife Service. *Id.* After the adoption of the 2003 revised rule, the Department secretly negotiated a Memorandum of Understanding ("MOU") with the State of Utah, signed on April 11, 2003, that specifies how the Disclaimer Rule will be used to recognize potentially tens of thousands of miles of claimed highways through public lands in Utah. Pls.' Stmt. of Facts P 9, n.1; Pls.' 2nd Am. Compl. P 20. On January 14, 2004, the State of Utah submitted its first request for a right-of-way under R.S. 2477 pursuant to the MOU, with at least nineteen other submissions planned. Pls.' 2nd Am. Compl. P 22.

In an effort to garner information regarding the Department's policy shifts and to determine the new policy's potential impact on public lands, Plaintiffs submitted separate FOIA requests via facsimile and email with three government offices on September 26, 2003 -- one with the Department of the Interior, one with the Bureau of Land Management's Washington, D.C., headquarters office, and one with the Arizona State Office of the Bureau of Land [*6] Management. *Id.* P 23; Pls.' Stmt. of Facts P 9; Pl.'s Mot. for Summ. J., Exs. 2-4. Plaintiffs requested:

> **all records** (including but not limited to documents, information, faxes, letters, comments, emails, summaries of tele-

phone conversations, handwritten notes, meeting minutes, or any other materials) generated, modified, or acquired by . . . [each agency] **relating to or otherwise concerning** the following:

> . implementation of revisions to regulations concerning Recordable Disclaimers of Interest, 43 C.F.R. Part 1860, adopted January 6, 2003;

> . submission of requests for recordable disclaimers;

> . memoranda of understanding (MOUs) or other agreements concerning recordable disclaimers of interest and/or rights-of-way under Revised Statute (R.S.) 2477, including but not limited to the MOU entered into between the Interior Department and the State of Utah on April 9, 2003;

> . policy, rules, legislation, or guidance relating to R.S. 2477;

> . any and all individual R.S. 2477 claims or assertions; and

> . any and all R.S. 2477 potential claims or potential assertions.

Pls.' 2nd Am. Compl. P 23; Pls.' Stmt. of Facts P [*7] 9; Exs. 2-4 at 1 (emphasis in original).

Nearly two months after Plaintiffs submitted their three FOIA requests to Defendants, the Department sent Plaintiffs a letter on November 19, 2003, that simply acknowledged its receipt of Plaintiffs' various FOIA requests. Pls.' Stmt. of Facts P 11. The Department's November 19, 2003 letter did not provide Plaintiffs with any of the requested information, and did not inform Plaintiffs of their appeal rights. *Id.* However, the November 19, 2003 letter did indicate that the Department was then "in the process of issuing a determination on

[Plaintiffs'] request for a fee waiver." Pls.' Corrected Opp'n, Ex. 4 at 1. On December 10, 2003, the Department informed Plaintiffs that it had made a "decision to deny your request for a waiver of FOIA processing fees for the entirety of your request." Pls.' Stmt. of Facts P 12; Pls.' Mot. for Summ. J., Ex. 6 at 3. The December 10, 2003 letter stated that Plaintiffs could appeal the "decision to deny your request for a waiver of FOIA processing fees for the entirety of your request," Pls.' Corrected Opp'n, Ex. 5 at 3, or -- rather than appeal -- Plaintiffs could (1) limit their request to documents already [*8] available to the public and receive such at no cost; (2) specify an amount that they were willing to pay so that the Department could process the request to the extent that the agreed amount covered the Department's costs; or (3) agree to pay the full costs of processing the entire request, id. at 4-5. The December 10, 2003 letter did not provide an estimate of the costs associated with processing Plaintiffs' FOIA requests. See id.

Plaintiffs administratively appealed the Department's denial of their fee waiver petition on December 19, 2003. Pls.' Stmt. of Facts P 13; Pls.' Mot. for Summ. J., Ex. 8. In their appeal, Plaintiffs asserted that they were entitled to a waiver of fees pursuant to 5 U.S.C. ß 552(a)(4)(A)(iii) and 43 C.F.R. ß 2.19, and also appealed the Department's failure to determine and announce what documents it would release or withhold as required by 5 U.S.C. ß 552(a)(6)(A)(i). Id. The Department did not address Plaintiffs' appeal until April 6, 2004, upon which it issued a decision that did not grant the requested fee waiver and did not respond to Plaintiffs' appeal of the Department's alleged failure to promptly [*9] provide the requested records. Pls.' Stmt. of Facts PP 13-14; Pls.' Mot. for Summ. J., Ex. 9 at 1.

Meanwhile, on February 6, 2004, the Department provided a partial, incomplete response to Plaintiffs' three FOIA requests. Pls.' Stmt. of Facts P 15; Pls.' Mot. for Summ. J., Ex. 11. This February 6 response acknowledged the it was "limited" to a subset of the requested records -- namely, the external correspondence and final agency documents for which Plaintiffs would have qualified for a full fee waiver -- from one of the Department's offices, as it was "still awaiting file search results" from the other two offices to which Plaintiffs had directed their requests. Id. The letter accompanying this production noted that the Department was enclosing copies of fifty-three (53) documents, and that "redactions will be clearly identified and labeled." Pls.' Corrected Opp'n, Ex. 10 at 2. On March 22, 2004, Plaintiffs appealed this February 6, 2004 partial response, reiterating their December 19, 2003 challenge to the Department's alleged failure to respond by providing all responsive records in a timely manner and expanding their challenge to "unlawful" redactions in several of the fifty-three [*10] documents

provided in the February 6, 2004 partial response. Pls.' Corrected Opp'n, Ex. 11 at 2. On April 27, 2004, the Department notified Plaintiffs that their appeal was "awaiting legal review," that a response would be provided "as soon as possible," and that Plaintiffs had the right to "treat the delay in responding . . . as a final denial" of their appeal. Pls.' Corrected Opp'n, Ex. 12 at 1.

In response to the delays encountered, Plaintiffs filed a Complaint before this Court on April 22, 2004. Plaintiffs amended their original complaint on June 9, 2004, and -- with Defendants' consent -- submitted a Second Amended Complaint on July 27, 2004. Plaintiffs' Second Amended Complaint contends that the Department's actions violated the strictures of the FOIA in three separate ways: (1) Defendants failed to provide Plaintiffs with all of the information requested in their September 2003 FOIA requests in a timely manner; (2) Defendants failed to grant Plaintiffs a waiver of fees with respect to the information requested; and (3) Defendants failed to make a determination on Plaintiffs' appeal of the denial of the fee waiver requested in their September 26, 2003 FOIA request letters. [*11] See 2nd Am. Compl. at 12. On July 29, 2004, after ten months of effectively denying Plaintiffs their fee waiver request, personnel of the Department signed a declaration stating that "upon careful consideration, the Department has reversed its earlier decision to deny Plaintiff's [sic] request for fee waivers" and that with this reversal, the Department considers "the fee waiver issue to be resolved." Defs.' Mot. to Dismiss, Ex. 1 (7/29/04 Decl. of Ms. Sue Ellen Sloca) at P 3.

Defendants, on August 10, 2004, filed a Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay. Defendants argue that dismissal is warranted under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for two reasons: (1) because -- according to Defendants -- "Plaintiffs here have advanced a pure challenge to the Department's refusal to grant a fee-waiver without any component challenging the underlying policy associated with the fee waiver," "Plaintiffs' fee waiver challenge is mooted by the Department's decision to grant the fee waiver," Defs.' Mot. to Dismiss at 3; and (2) Plaintiffs failed to exhaust their administrative remedies as required, id. at 4-5. In [*12] the alternative, Defendants request a six-month *Open America* stay. Id. at 5-9. After simply setting forth the case law relevant to such a stay, Defendants assert *in toto*:

> As should be apparent now, Defendants, by regulation could not fully process Plaintiffs' FOIA request until the fee-waiver issue has been resolved. Now that it has been resolved by the Department's

reversing its decision, the DOI can now fully process the request. Because Plaintiffs effectively concede that they were given the opportunity to limit their request, but refused to do so, instead filing suit, both exceptional circumstances and due diligence should be found to exist[.]

Defs.' Mot. to Dismiss at 8-9. In their motion, Defendants do not specifically identify the due diligence exercised as to Plaintiffs' requests, nor do they explicate the exceptional circumstances necessitating the delay, nor do they attach any affidavits attesting to such alleged facts. *See generally* Defs.' Mot. to Dismiss.

In addition to opposing Defendants' motion, n1 Plaintiffs filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on October 4, 2004, in which they assert that [*13] summary judgment in their favor is appropriate due to the fact that the Department "has failed for more than a full year to comply with a statutory deadline requiring a response to [Plaintiffs'] FOIA requests within 20 days" -- i.e., 5 U.S.C. ß 552(a)(6)(A)(i). *See* Pls.' Mot. for Summ. J. at 9. Plaintiffs also contend that the Department's "illegal failure to timely grant [Plaintiffs'] fee waiver cannot excuse the agency's failure to timely respond to [Plaintiffs'] requests." *Id.* at 8. n2

> n1 "Due to an error of counsel," Plaintiffs' counsel "inadvertently mischaracterized Plaintiffs' Second Amended Complaint" in "several places" in its two initial Oppositions to Defendants' Motion to Dismiss. *See, e.g.,* Pls.' Unopposed Mot. to File a Corrected Opp'n at 1. As such, with Defendants consent, Plaintiffs filed two separate Unopposed Motions to File a Corrected Opposition, each of which the Court shall grant.

> n2 Defendants failed to respond to Plaintiffs' Motion for Summary Judgment within the requisite time period. As such, on November 2, 2004, Plaintiffs filed a Motion to Treat as Conceded Plaintiffs' Motion for Summary Judgment. On November 4, 2004, Defendants filed with this Court a Motion for Leave to File an Opposition to Plaintiffs' Motion for Summary Judgment, which the Court granted *nunc pro tunc* on November 17, 2004. As such, Plaintiffs' Motion to Treat as Conceded Plaintiffs' Motion for Summary Judgment is denied as moot.

[*14]

In the time period subsequent to the parties' motions, the Department has provided Plaintiffs with two supplemental installments of documents responsive to their September 26, 2003 FOIA requests -- one of which arrived on April 8, 2005, and the other of which was provided on July 7, 2005. *See* Pls.' 5/20/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J.; Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. While certainly much more substantial than the first installment provided on February 6, 2004, Plaintiffs consider these responses "incomplete" due to the fact that Defendants have withheld numerous documents and "heavily-redacted" other records pursuant to FOIA Exemption 5 "without satisfying the most basic standards for invoking exemptions." Pls.' 5/20/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. at 2. In support of *their* claim, Plaintiffs have highlighted several examples of "documents withheld in full or in part [which] are simply stamped Exemption 5' with absolutely no indication on them as to why they might be exempt from disclosure." Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. at 4. Defendants [*15] have not filed a response to Plaintiffs' supplemental notices, nor have they filed a *Vaughn* index detailing the withheld documents and relevant redactions.

## II: LEGAL STANDARDS

As noted previously, Defendants have moved to dismiss Plaintiffs' action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and, in the alternative, have moved for a stay under the doctrine elicited in *Open America v. Watergate Special Prosecution Force*, 178 U.S. App. D.C. 308, 547 F.2d 605 (D.C. Cir. 1976). In contrast, Plaintiffs have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The Court shall discuss the relevant legal standards for each motion in turn.

### A. Defendants' Motion

#### 1. Rule 12(b)(1)

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1). In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to relief." *Kowal v. MCI Commun. Corp.*, 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citations omitted). A court may appropriately dispose of a case [*16] under 12(b)(1) for standing, and may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 357 U.S. App. D.C. 72, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Artis v. Greenspan*,

2005 U.S. Dist. LEXIS 20042, *

223 F. Supp. 2d 149, 152 n.1 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment") (citing *Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507, 515 (6th Cir. 1999)). At the stage in litigation when dismissal is sought, the plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. [*17] *EEOC v. St. Francis Xavier Parochial Sch.*, 326 U.S. App. D.C. 67, 117 F.3d 621, 624 (D.C. Cir. 1997); *Leatherman v. Tarrant County Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000); *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F. Supp. 2d 15, 18 (D.D.C.1998).

2. Rule 12(b)(6)

"In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, unlike resolving a motion under Rule 12(b)(1), the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 199 U.S. App. D.C. 23, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be liberally [*18] construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are not supported by the facts set out in the complaint." *Kowal*, 16 F.3d at 1276. Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 328 U.S. App. D.C. 52, 132 F.3d 753, 762 (D.C. Cir. 1997). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See St. Francis Xavier Sch.*, 117 F.3d at 624; *Marshall County Health Care Auth. v. Shalala*, 300 U.S. App. D.C. 263, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993). Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion,

particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy*, 308 U.S. App. D.C. 36, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf.* [*19] *Behrens v. Pelletier*, 516 U.S. 299, 309, 133 L. Ed. 2d 773, 116 S. Ct. 834 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

3. *Open America* Stay

Under Section 552 (a)(6)(C)(i) of FOIA, the Government may obtain a stay of proceedings "if the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. ß 552(a)(6)(C)(i). In *Open America*, the D.C. Circuit addressed Section 552(a)(6)(C)(i) and found that an agency is entitled to additional time under FOIA's "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

547 F.2d at 616 (quoting 5 U.S.C. ß 552 (a)(6)(C)). Effective October 2, 1997, as part of the Electronic Freedom of Information Amendments of 1996, Congress added [*20] the following two subsections to Section 552(a)(6)(C):

> (ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

> (iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. ß 552 (a)(6)(C)(ii), (iii). The legislative history of the 1996 amendments reveals that Congress, having considered the decision in *Open America*, intended the amendments to be "consistent with the holding in *Open America*," and sought only to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104-795 at 24 (1996), *reprinted in* 1996 U.S.C.C. [*21] A.N. 3448, 3467. However, the amendments clearly contemplate that other circumstances, such as an agency's efforts to reduce the number of pending requests, the amount of classified material, the size and complexity of other requests processed by the agency, the resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals, are relevant to the courts' determination as to whether exceptional circumstances exist. *Id.*

When considering a request for an *Open America* stay, "agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. Secs. & Exch. Comm'n*, 288 U.S. App. D.C. 324, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted).

### B. Plaintiffs' Motion

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); [*22] *Tao v. Freeh*, 307 U.S. App. D.C. 185, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendants, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiffs, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, [*23] the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). [*24] Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

Currently before the Court are Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay Pursuant to 5 U.S.C. ß 552(a)(6)(C), and Plaintiffs' Motion for Summary Judgment. The Court shall address each motion in turn.

### A. Defendants' Motion to Dismiss or for an Open America Stay

#### 1. Motion to Dismiss

Defendants make two arguments in favor of dismissal of Plaintiffs' Second Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. First, Defendants claim that "Plaintiffs here have advanced a pure challenge to the Department's refusal to grant a fee-waiver without any component challenging the underlying policy associated with the fee waiver." Defs.' Mot. to Dismiss at 3. [*25] As such, given the fact that the July 29, 2004 Declaration of Ms. Sue Ellen Sloca, Office of the Secretary, Department of the Interior, noted that "the Department has reversed its earlier decision to deny Plaintiffs' [sic] requests for fee waivers for te processing of the Requests," *see id.*, Ex. 1 (7/29/04 Decl. of Ms. Sue Ellen Sloca) at P 3, De-

fendants assert that the claims within Plaintiffs' Second Amended Complaint are moot. *Id.* at 3 (citing *Better Gov't Ass'n v. Dep't of State*, 250 U.S. App. D.C. 424, 780 F.2d 86, 91 (D.C. Cir. 1986); *Pub. Citizen v. Dep't of State*, 349 U.S. App. D.C. 291, 276 F.3d 634, 641 (D.C. Cir. 2002)). Second, Defendants contend that Plaintiffs have failed to exhaust their administrative remedies, an essential requirement before a party can seek judicial review. *Id.* at 4 (citing *Dettmann v. Dep't of Justice*, 802 F.2d 1472, 1477, 256 U.S. App. D.C. 78 (D.C. Cir. 1986)). Specifically, Defendants argue that because Plaintiffs failed to pay the required fees and appealed the decision denying the fee waiver, their "appeal was not effective as to the full processing of the FOIA request, since by regulation full processing could not occur before the fee issue had been [*26] resolved." *Id.* at 5.

Each argument forwarded by Defendants is without merit. First, Defendants misconstrue the scope of Plaintiffs' Second Amended Complaint. Plaintiffs' Second Amended Complaint alleges at least two distinct violations of FOIA: (1) the Department's failure to make available the requested records and its failure to make a determination as to whether it would provide or withhold requested records within the stated twenty-day deadline; and (2) the Department's failure to make a determination concerning Plaintiffs' fee waiver request. *See* Pls.' 2nd Am. Compl. PP 31-40 & 12. Defendants' July 29, 2004 decision to grant Plaintiffs' fee petition, after nearly one year of obfuscation and various denials, only renders moot the second argument propounded by Plaintiffs in their Second Amended Complaint. Plaintiffs' first contention that "because the [Department] continues to violate FOIA's mandate to provide records promptly' and to make a determination as to whether [the Department] would provide or withhold requested records and to respond to a FOIA appeal within 20 days" remains in live controversy. *See* Pls.' Corrected Opp'n at 10. Given the broader [*27] scope of Plaintiffs' Second Amended Complaint and the issues still in controversy, it is clear that Defendants' assertion that the entire case is moot is certainly without foundation.

Second, federal case law makes plain the fact that Plaintiffs have exhausted their administrative remedies sufficient to establish jurisdiction in this case vis-a-vis their remaining claims. Before proceeding with this suit, Plaintiffs pursued a two-track administrative appeals process. For instance, Plaintiffs administratively appealed the Department's December 10, 2003 denial of their fee waiver petition by filing an appeal on December 19, 2003 in which they (1) asserted that they were entitled to a waiver of fees pursuant to 5 U.S.C. ß 552(a)(4)(A)(iii) and 43 C.F.R. ß 2.19, and (2) appealed the Department's failure to determine and announce what documents it would release or withhold as required by 5 U.S.C. ß 552(a)(6)(A)(i). Pls.' Stmt. of Facts P 13; Pls.' Mot. for Summ. J., Ex. 8. Next, Plaintiffs appealed Defendants' February 6, 2004 partial response with a filing on March 22, 2004 that reiterated their December 19, 2003 challenge to the Department's [*28] alleged failure to respond by providing all responsive records in a timely manner and expanded their challenge to the "unlawful" redactions in several of the fifty-three documents provided in the February 6, 2004 partial response. Pls.' Corrected Opp'n, Ex. 11 at 2. After these two appeals, the Department notified Plaintiffs on April 27, 2004 that their March 22, 2004 appeal was "awaiting legal review," that a response would be provided "as soon as possible," and that Plaintiffs had the right to "treat the delay in responding . . . as a final denial" of their appeal. Pls.' Corrected Opp'n, Ex. 12 at 1. In this April 27, 2004 letter, the Department specifically informed Plaintiffs that, given the delay they had experienced, Plaintiffs could now "seek judicial review in the United States District Court for the District in which you reside or have your principal place of business, the District in which the records subject to your appeal are located, or the United States District Court for the District of Columbia." *Id.*

Accordingly, it is clear that at every opportunity Plaintiffs administratively appealed the (1) Department's delays in processing their FOIA request and fee waiver [*29] petitions, (2) the Department's denial of their fee waiver petition, and (3) the Department's withholding of certain documents and redactions in other provided records. Importantly, Plaintiffs filed suit in this Court only after two events -- each separately sufficient to establish jurisdiction -- took place. First, the Department actually informed Plaintiffs on April 27, 2004 that they were free to seek judicial relief in order to resolve these three areas of contention. *See* Pls.' Corrected Opp'n, Ex. 12 at 1. Second, Plaintiffs ensured that they had made several administrative appeals of the Department's initial decision to refuse to waive the fees associated with the processing of their FOIA requests. The law of this Circuit demonstrates that no further exhaustion by Plaintiffs is required to pursue their claim that Defendants have unlawfully failed to respond to their FOIA requests. *See, e.g., Oglesby v. Dep't of the Army*, 287 U.S. App. D.C. 126, 920 F.2d 57, 66 (D.C. Cir. 1990) ("Exhaustion does not occur until the required fees are paid *or an appeal is taken from the refusal to waive fees*") (emphasis added); *Maydak v. Dep't of Justice*, 254 F. Supp. 2d 23, 49 (D.D.C. 2003) [*30] ("The payment or waiver of fees or an administrative appeal from the denial of a fee waiver request is a jurisdictional prerequisite to bringing suit on a FOIA claim in district court."); *Krese v. Executive Office of the President*, Civ. A. No. 99-2415 (JR), 2000 U.S. Dist. LEXIS 14024, at * 3 (D.D.C. Sept. 25, 2000) (same). As such, Defendants' allegation that Plaintiffs are somehow attempting to "leapfrog" over the administra-

tive appeal process is simply without merit. Given that a portion of Plaintiffs' Second Amended Complaint remains in controversy, and Plaintiffs properly exhausted their administrative remedies, Defendants' Motion to Dismiss must be denied.

### 2. Motion for a Six-Month *Open America* Stay

In the alternative, Defendants move for a six-month stay of these proceedings under 5 U.S.C. ß 552(a)(6)(C)(i) and *Open America v. Watergate Special Prosecution Force*, 547 F.2d at 616, to allow them "an opportunity to fully prosecute Plaintiffs' FOIA requests as required." Defs.' Mot. to Dismiss at 5. According to Defendants, "a period of six months" is required, "depending upon the true scope of Plaintiffs' requests, [*31] to process them." *Id.* Defendants contend that Plaintiffs could have expedited their request previously given that they were provided the opportunity to limit their request, and assert that "both exceptional circumstances and due diligence should be found to exist." *Id.* at 8-9.

Defendants' Motion for an *Open America* stay must fail for two reasons. First, given that Defendants filed their motion on August 10, 2004, and provided Plaintiffs with supplemental documents pursuant to their FOIA requests on April 8, 2005 and July 7, 2005, it is clear from the record that any further extension of the production timeline is simply unwarranted. Second, Defendants fail to meet the standard for an *Open America* stay to extend their production timeline. Pursuant to the 1996 amendments, Congress tightened the standard for obtaining a stay by defining the term "exceptional circumstances" so as to exclude any "delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of requests." 5 U.S.C. ß 552(a)(6)(C)(ii). Under D.C. Circuit law, a stay pursuant to this subsection and the [*32] *Open America* doctrine may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising due diligence' in processing the requests; *and* (4) the agency shows reasonable progress' in reducing its backlog of requests." *Williams v. Fed. Bureau of Investigation*, Civ. A. No. 99-3378 (AK), 2000 U.S. Dist. LEXIS 17493, at * 4 (D.D.C. Nov. 30, 2000) (emphasis in original); *see also Summers v. Dep't of Justice*, 288 U.S. App. D.C. 219, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors). Agency affidavits provide a critical insight into this process, and are often determinative. *See SafeCard Servs.*, 926 F.2d at 1200; *Aguilera v. Fed. Bureau of Investigation*, 941 F. Supp. 144, 149 (D.D.C. 1996) (citing agency affidavits in addressing stay criteria).

Here, Defendants have failed to provide any evidence or make any allegations that would meet the standards necessary to support a stay. Defendants' Motion to Dismiss contains no [*33] specifics other than a bald assertion that "both exceptional circumstances and due diligence should be found to exist." Defs.' Mot. to Dismiss at 8-9. Defendants provide no analysis, statistics, affidavits, declarations or other sworn statements from agency personnel to support this contention. In Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, Defendants "expand" this argument by noting that the Department "proffers that it is inundated with a large volume of FOIA requests and that it is unable to process the request submitted by Plaintiffs within the statutorily commanded period of time." Defs.' Opp'n at 4. Once again, Defendants fail to support this claim with any analysis, statistics, agency affidavits, declarations, or other sworn statements. Accordingly, the factors relied upon by previous courts to make a finding of "exceptional circumstances" are conspicuously absent here. *See, e.g., Edmond v. United States Attorney*, 959 F. Supp. 1, 3 (D.D.C. 1997) (declarations filed by defendants providing explanations for backlog and describing attempts to remedy the delay by reassigning staff); *Jimenez v. Fed. Bureau of Investigation*, 938 F. Supp. 21, 31 (D.D.C. 1996) [*34] (agency submitted declarations detailing limited agency resources and FOIA response backlog); *Kuffel v. Bureau of Prisons*, 882 F. Supp. 1116, 1127 (D.D.C. 1995) ("The agencies have provided evidence in their affidavits. . . ."). Defendants do no more than allege that the Department faces a large but unspecified volume of requests; as such, they simply fail to establish (1) an unanticipated number of requests; (2) inadequate resources; (3) that they are exercising "due diligence"; and (4) that they are making "reasonable progress" in the reduction of their backlog of FOIA requests. Given that Defendants fail to meet the necessary standards, Defendants motion for an *Open America* stay must be denied.

### B. Plaintiffs' Motion for Summary Judgment

Plaintiffs, in their initial Motion for Summary Judgment, make the relatively straight-forward argument that they are entitled to summary judgment pursuant to 5 U.S.C. ß 552(a)(6)(A)(i), 43 C.F.R. ß 2.12(a) -- the implementing regulations for FOIA that require the Department to have responded to Plaintiffs' September 26, 2003 FOIA requests by October 27, 2003. *See* Pls.' Mot. for Summ. J. at 6. [*35] Given that Defendants did not even acknowledge Plaintiffs' request until November 19, 2003, and did not provide Plaintiffs with any information concerning the content of their requests for more than a year following this communication, Plaintiffs contend that they are entitled to summary judgment. *Id.*

However, after Plaintiffs' filed their Motion for Summary Judgment, Defendants expanded their initial

February 6, 2004 partial production of documents and provided Plaintiffs with several hundreds of pages of material on both April 8, 2005 and July 7, 2005. *See* Pls.' 5/20/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J.; Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. In response, Plaintiffs have filed two "Notices of Supplemental Authority in Support of Their Motion for Summary Judgment" that discuss in depth these additional productions and assert that (1) the Department has failed to conduct a reasonable search for the requested documents, *see, e.g.*, Pls.' 8/18/05 Notice of Suppl. Auth. in Supp. of their Mot. for Summ. J. at 3; and (2) the Department's submission of some, heavily-redacted records does not satisfy with its obligation [*36] to comply with FOIA, *id.* Plaintiffs further argue that "for virtually all the redactions" the Department invokes FOIA Exemption Five but fails to satisfy its "heavy burden of showing how the specific privilege applies to each of the redacted or withheld records." *Id.* at 3-4 (emphasis in original).

Upon a review, it is clear that Defendants' decision to produce requested documents to Plaintiffs and Plaintiffs' subsequent Notices of Supplemental Authority have significantly altered the parameters of Plaintiffs' initial Motion for Summary Judgment. Despite this material alteration, Defendants have provided no response to the assertions contained within Plaintiffs' Notices of Supplemental Authority, nor have they filed anything with the Court approximating a *Vaughn* index. Given the sheer lack of material before the Court at this time and the need for a new set of motions to accompany this new stage in the litigation, the Court shall deny without prejudice Plaintiffs' current Motion for Summary Judgment and shall grant Plaintiffs leave to refile an expanded motion at the appropriate time. Rather than proceed down the path to which this litigation has been drifting, the [*37] Court shall give the parties until September 28, 2005 to communicate and discuss (1) what materials have been provided, or are predicted to be provided (and when); (2) what materials have been withheld, or are predicted to be withheld (and when); and (3) what materials have been redacted, or are predicted to be redacted (and when). The parties are to meet and discuss whether they can come to an agreement over any areas in which they have a difference of opinion. If the parties are unable to reach an agreement, they shall provide this Court with a Joint Status Report on September 28, 2005 that sets out where the parties are in the current production phase and what disputes remain. In the Joint Status Report, the parties are also to propose dates to the Court for the filing of the *Vaughn* index in this case, and for the anticipated cross-motions for summary judgment to accompany the completion of the FOIA production process.

## IV: CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss or, in the Alternative, for a Six-Month *Open America* Stay is denied. Further, Plaintiffs' Motion for Summary Judgment is denied without prejudice. Moreover, Plaintiffs' two [*38] motions to amend or correct their Oppositions to Defendants' Motion to Dismiss are granted, and Plaintiffs' Motion to Treat as Conceded Plaintiffs' Motion for Summary Judgment is denied *nunc pro tunc.* Finally, Plaintiffs and Defendants are to meet and construct a Joint Status Report to be filed with this Court by September 28, 2005, in which they inform the Court of the status of the FOIA production and set out proposed dates for the filing of a *Vaughn* index and the anticipated cross-motions for summary judgment. An Order accompanies this Memorandum Opinion.

Date: September 12, 2005

COLLEEN KOLLAR-KOTELLY

United States District Judge

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 12th day of September, 2005, hereby

**ORDERED** that [14] Defendants' Motion to Dismiss or, in the Alternative, Motion for an *Open America* Stay is DENIED; it is further

**ORDERED** that [19] Plaintiffs' Motion to Amend/Correct [18] Plaintiffs' Memorandum in Opposition to [14] Defendants' Motion to Dismiss or, in the Alternative, Motion for an *Open America* Stay is GRANTED; it is further

**ORDERED** that [20] Plaintiffs' Unopposed [*39] Motion to Amend/Correct [18] Plaintiffs' Memorandum in Opposition to [14] Defendants' Motion to Dismiss or, in the Alternative, Motion for an *Open America* Stay is GRANTED; it is further

**ORDERED** that [21] Plaintiffs' Motion for Summary Judgment is DENIED WITHOUT PREJUDICE; it is further

**ORDERED** that [23] Plaintiffs' Motion to Treat as Conceded [21] Plaintiffs' Motion for Summary Judgment is DENIED *nunc pro tunc;* it is further

**ORDERED** that the parties are to meet and confer, and provide the Court with a Joint Status Report by Wednesday, September 28, 2005 setting out the information and proposed dates as specified in this Court's accompanying Memorandum Opinion.

**SO ORDERED.**

2005 U.S. Dist. LEXIS 20042, *

COLLEEN KOLLAR-KOTELLY                              United States District Judge

# Exhibit 6

*Electronic Frontier Foundation v. Department of Justice*, No. 06-1708 (CKK)

Plaintiff's Opposition to Defendant's Motion for an *Open America* Stay

LEXSEE 2005 U.S. DIST. LEXIS 18876

ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff, v. UNITED
STATES DEPARTMENT OF JUSTICE, et al., Defendants.

Civil Action No. 02-0063 (CKK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2005 U.S. Dist. LEXIS 18876

August 31, 2005, Decided
August 31, 2005, Filed

**PRIOR HISTORY:** Elec. Privacy Info. Ctr. v. United States DOJ, 2004 U.S. Dist. LEXIS 28485 (D.D.C., Aug. 23, 2004)

**COUNSEL:** [*1] For ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff: Chris Jay Hoofnagle, ELECTRONIC PRIVATE INFORMATION CENTER, San Francisco, CA.

For U.S. DEPARTMENT OF JUSTICE, DEPARTMENT OF THE TREASURY, Defendants: Vesper Mei, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

### MEMORANDUM OPINION

(August 31, 2005)

Plaintiffs initiated this action on January 14, 2002, seeking release of agency records under the Freedom of Information Act ("FOIA"), 5 U.S.C. ß 552, related to government use of privately owned databases containing personal information. Currently before the Court is Defendants' motion for a stay of proceedings in the above-captioned action until August 31, 2005 pursuant to the doctrine announced in *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 178 U.S. App. D.C. 308 (D.C. Cir. 1976). According to Defendants, although the Federal Bureau of Investigation ("FBI") is exercising due diligence in responding to the Plaintiff's FOIA request, exceptional circumstances have prevented it from completely processing Plaintiff's request -- which covers around 5,000 [*2] pages of documents relating to a classified contract between the Government and ChoicePoint, Inc., a private company that sells personal information -- within the statutory time limit. Plaintiff opposes Defendants' motion. Upon a review of the parties' filings, the attached exhibits, the lengthy affidavit submitted by Mr. Keith R. Gehle, Assistant Section Chief of the FBI's Record/Information Dissemination Section, the relevant case law, and the entire record herein, the Court shall grant Defendants' Motion for an *Open America* Stay.

### I: BACKGROUND

By a letter dated June 22, 2001, Plaintiff submitted a FOIA request to the FBI, seeking "all records relating to transactions, communications, and contracts concerning businesses that sell individuals' personal information." Compl., Ex. A (6/22/01 FOIA request). By a letter dated July 7, 2001, FBI Headquarters closed Plaintiff's request upon a finding that its parameters were too vague. *See* Defs.' Mot. to Stay, Ex. A (9/23/04 Decl. of Keith Gehle)("Gehle Decl.") at P 22. Following a clarification letter from Plaintiff dated August 8, 2001, FBI Headquarters subsequently acknowledged Plaintiff's request as seeking access to information [*3] concerning only ChoicePoint, Inc., a private company that sells personal information. *Id.* Following Defendants' lack of responsiveness, Plaintiff's filed this action on January 14, 2002.

As a result, what is now the FBI's Record/Information Dissemination Section began its search for documents responsive to Plaintiff's FOIA request on February 15, 2002. *Id.* The search revealed two large categories of potentially responsive documents: (1) documents related to a public contract that the FBI has with ChoicePoint to provide FBI employees access to information about individuals and companies as well as archived news databases; and (2) approximately 5,000 pages of documents related to a classified contract be-

2005 U.S. Dist. LEXIS 18876, *

tween the FBI and ChoicePoint. Once these documents were identified, it became apparent that the total volume of potentially responsive records would be quite large. *Id.* P 23. As such, after failed negotiations to narrow the scope of Plaintiff's FOIA request, the FBI proceeded on parallel tracks with regard to the two categories of documents. *Id.* As for the documents related to the public ChoicePoint contract, the FBI sought and obtained a stay of proceedings until January 31, 2003, and [*4] later through April 30, 2003, to complete its review, processing, and release of that material. *Id.*

With respect to the second category of documents, i.e., the classified ChoicePoint contract, Defendants notified Plaintiff of the existence of this material in a letter dated May 28, 2003, and informed Plaintiff that processing of the material would take in excess of eighteen (18) months. *See* 12/30/03 Pub. Decl. of J. Stephen Tidwell (then-Deputy Assistant Director of the FBI's Criminal Investigative Division) P 16. On October 1, 2003, after Plaintiff declined Defendants' invitation to exclude the material from its FOIA request, Defendants informed Plaintiff again that it would take the FBI approximately twenty-four (24) months to process the 5,000 pages. *Id.* P 18. On December 31, 2003, Defendants sought to exclude these 5,000 pages of material from the FOIA request, or alternatively to be granted an eighteen (18) month stay to process (b)(1) exemptions first, or a twenty-four (24) month stay to process the documents under all exceptions. *See* Defs.' Mot. to Exclude Classified Docs. From Pl.'s FOIA Request or, in the Alternative, to Brief FOIA Exemption (B)(1) Issues [*5] First or, in the Alternative, for an Extension of Time.

In a Memorandum Opinion and Order dated August 23, 2004, this Court denied Defendants' motion to exclude the 5,000 pages of documents relating to the classified ChoicePoint contract from processing, but invited Defendants to move for a stay pursuant to the doctrine set forth in *Open America. See Elec. Privacy Info. Ctr. v. United States DOJ*, 2004 U.S. Dist. LEXIS 28485, Civ. No. 02-0063 (CK), at 13 (D.D.C. Aug. 23, 2004) (memorandum opinion denying Defendants' motion to exclude documents) ("Defendant is invited to move for a stay that meets the *Open America* standard."). Taking the Court's invitation, Defendants filed the present Motion for an *Open America* Stay on September 23, 2004, claiming that exceptional circumstances exist to justify the delay in production of the 5,000 pages of documents responsive to Plaintiff's FOIA request.

In Defendants' filing, they note that the classification review of the 5,000 pages is presently ongoing at the FBI's Record/Information Dissemination Section Classification Unit ("CU"). Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") P 24. These documents are being reviewed first for the applicability of Exemption [*6] (b)(1), and are

being prepared for review by the Department of Justice's Department Review Committee ("DRC"). *Id.* A total of nine (9) FOIA paralegals in CU are performing the classification review, and -- at the time of Defendants' filing -- 3,535 pages were reviewed already for initial classification. *Id.* P 25. The DRC will then review all classification determinations in the documents at issue and concur or disagree with the CU's classification actions. *Id.* P 24. The CU will then apply the DRC's classification decisions to the documents, make the appropriate changes, and stamp the face of each document to indicate the date that the DRC review occurred. *Id.* After the CU and DRC complete their (b)(1) work on the documents, the collected material will be forwarded to the Disclosure Unit for a page-by-page, line-by-line review of the information to determine if any exemptions in addition to Exemption (b)(1) should be applied. *Id.* Although it was planned that the case was to be assigned to one (1) FOIA paralegal in the Disclosure Unit for processing, additional paralegals were to be made available for the assignment. *Id.* P 25. The FBI avers that it is committed [*7] to completing the review as expeditiously as possible while balancing the competing demands of other pending requests both in the litigation and administrative queues. *Id.*

## II: LEGAL STANDARDS

Under FOIA, an agency is required to determine within twenty (20) days of the receipt of a request for records "whether to comply with such request[,]" and "to immediately notify the person making such request of such determination and the reasons thereof." 5 U.S.C. ß 552(a)(6)(A)(i). However, this time limit can be extended by ten (10) working days if the agency determines that "unusual circumstances" exist. 5 U.S.C. ß 552(a)(6)(B).

Nevertheless, FOIA explicitly contemplates the possibility of a stay of judicial proceedings at the district court level. Under Section 552 (a)(6)(C)(i) of FOIA, the Government may obtain a stay of proceedings "if the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. ß 552(a)(6)(C)(i). Moreover, in *Open America*, the D.C. Circuit addressed Section 552(a)(6)(C)(i) and found that an agency is entitled to additional time [*8] under FOIA's "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the

agency can show that it "is exercising due diligence" in processing the requests.

547 F.2d at 616 (quoting 5 U.S.C. ß 552 (a)(6)(C)). Effective October 2, 1997, as part of the Electronic Freedom of Information Amendments of 1996, Congress added the following two subsections to Section 552(a)(6)(C):

> (ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

> (iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person [*9] made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. ß 552 (a)(6)(C)(ii), (iii). The legislative history of the 1996 amendments reveals that Congress, having considered the decision in *Open America*, intended the amendments to be "consistent with the holding in *Open America*," and sought only to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104-795 at 24 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3467. However, the amendments clearly contemplate that other circumstances, such as an agency's efforts to reduce the number of pending requests, the amount of classified material, the size and complexity of other requests processed by the agency, the resources being devoted to the declassification of classified material of public interest, and the number of requests for records by courts or administrative tribunals, are relevant to the courts' determination as to whether exceptional circumstances exist. *Id.*; *see also* EFOIA Report, at *23, H.R. Rep. No. 106-50, 106th Cong., 1st Sess., 1999 WL 132731, [*10] at *13 (Mar. 11, 1999).

Following the decision in *Open America*, courts in the D.C. Circuit "have interpreted [Section (a)(6)(C)] as excusing any delays encountered in responding to a request as long as the agencies are making a good faith effort and exercising due diligence in processing the requests on a first-in first-out basis." *Kuffel v. U.S. Bureau of Prisons*, 882 F. Supp. 1116, 1127 (D.D.C. 1995) (citations omitted); *see also Edmond v. United States Atty.*, 959 F. Supp. 1, 3 (D.D.C. 1997) ("Courts have uniformly granted the government reasonable periods of time in which to review FOIA requests when there is a backlog."); *Ferguson v. Fed. Bureau of Investigation*, 722 F. Supp. 1137, 1140 (S.D.N.Y. 1989) ("In the D.C. Circuit, courts generally have granted extensions when presented with evidence of an overburdened agency following necessary procedures.") (citations omitted).

Under D.C. Circuit law, a stay pursuant to this subsection and the *Open America* doctrine may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests [*11] within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising due diligence' in processing the requests; *and* (4) the agency shows reasonable progress' in reducing its backlog of requests." *Williams v. FBI*, 2000 U.S. Dist. LEXIS 17493, at *4, Civ. A. No. 99-3378 (AK) (D.D.C. Nov. 30, 2000) (emphasis in original); *see also Summers v. Dep't of Justice*, 288 U.S. App. D.C. 219, 925 F.2d 450, 452 n.2 (D.C. Cir. 1991) (noting first three factors). Agency affidavits provide a critical insight into this process, and are often determinative. *See SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200, 288 U.S. App. D.C. 324 (D.C. Cir. 1991) (citations and internal quotation marks omitted) ("Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."); *Aguilera v. Fed. Bureau of Investigation*, 941 F. Supp. 144, 149 (D.D.C. 1996) (citing agency affidavits in addressing stay criteria).

## III: DISCUSSION

Upon a searching examination of parties' filings, the attached exhibits, [*12] Mr. Gehle's Affidavit, and the relevant case law, the Court concludes that Defendants have met the standards necessary to obtain an *Open America* stay. The Court finds that Defendants have established both that exceptional circumstances exist and that the FBI has been proceeding with its response to Plaintiff's FOIA request with due diligence. Accordingly, the Court shall grant Defendants' motion for a stay of proceedings in this matter until August 31, 2005, pursuant to the doctrine elicited in *Open America*.

First, the Court concludes that "exceptional circumstances" exist to warrant the imposition of a temporary *Open America* stay -- i.e., the FBI (1) is currently inundated with an unanticipated amount of lengthy FOIA

requests, (2) its current resources are inadequate to re-spond to these requests, including Plaintiff's request, in the time period set forth by the statute, and (3) the agency clearly has made reasonable progress in reducing its once-substantial backlog despite these exceptional circumstances. Importantly, FOIA places an extreme burden on the FBI's information processing resources: the FBI receives an average of 700 FOIA requests each month, and due to [*13] the rise in litigation and appeals over the last twenty years, the FBI's FOIA backlog jumped from its 1985 level of 4,736 requests to a high of 16,244 requests on December 31, 1996. *See* Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") P 8. Due to this backlog, the agency sought additional funding from Congress, which provided it with over 368 new employees in the 1997 and 1998 budgets. *Id.* P 14. Due to this influx of staffing and continued good faith responsiveness, the FOIA backlog has fallen from the high of 16,244 on De-cember 31, 1996 to the August 30, 2004 figure of 1,763 requests currently outstanding -- a reduction of roughly 89%. *Id.* The FBI anticipates that future totals will reflect a continuation of this downward trend. *Id.* As such, while the FBI currently faces a large backlog of requests, the recent reduction of that unanticipated backlog certainly constitutes "reasonable progress" as required by Section 552(a)(6)(C)(ii).

Moreover, despite this commendable reduction, it is also plain that the FBI's current resources remain inade-quate to respond to FOIA requests such as those made by Plaintiff within the time required by statute. First, em-ployees within the FBI's [*14] Record/Information Dis-semination Section must now split their time with other, ever-increasing duties. For instance, handling administra-tive appeals -- of which there were approximately 480 pending resolution on August 30, 2004 -- consumes sub-stantial amounts of FOIA staff time, taking employees away from their regular processing efforts. *Id.* P 9. The Record/Information Dissemination Section has also as-sumed significant litigation responsibilities, which fur-ther reduce the amount of available processing time. *Id.* P 10. On August 30, 2004, the FBI was involved in ap-proximately 150 pending lawsuits in various federal courts involving roughly 650 FOIA requests. *Id.* Second, in response to the tragic events of September 11, 2001, the FBI has diverted manpower to assist with the ongo-ing "war on terrorism." *Id.* P 13. In furtherance of the FBI's newfound responsibilities, the agency has shifted and refocused many of its priorities and resources in a manner that has resulted in the shifting, or "detailing," of numerous paralegal assistants from the Re-cord/Information Dissemination Section to operational divisions within FBI Headquarters for indeterminate pe-riods of time to work [*15] in support of the "war on terrorism." *Id.* This has further exacerbated the resource crunch within the Record/Information Dissemination

Section and ensured that its resources are currently in-adequate to ensure that response time to FOIA requests falls within the statutory timeframe.

In weighing these factors, the Court concludes that the FBI faces "exceptional circumstances" warranting an *Open America* stay. The Court notes that its finding is consonant with the recent rulings of other courts within this jurisdiction. *See, e.g., Summers v. Cent. Intelligence Agency*, Civ. No. A. 98-1682, at 1-2 (D.D.C. July 26, 1999) (memorandum opinion granting stay because "the FBI has demonstrated through its affidavits that excep-tional circumstances do exist, the agency is exercising due diligence in processing requests, and it is making reasonable progress in reducing its backlog"); *Haddon v. Freeh*, 31 F. Supp. 2d 16, 19 (D.D.C. 1998) (noting that court had granted an *Open America* stay until January 1998 on request submitted to the FBI nearly four years before); *Narducci v. Fed. Bureau of Investigation*, Civ. A. No. 98-0130, at 1 (D.D.C. July 17, 1998) (granting [*16] approximately three-year stay because the FBI "is deluged with a volume of requests for information vastly in excess of that anticipated by Congress"); *Guzzino v. FBI*, 1997 U.S. Dist. LEXIS 462, Civ. A. No. 95-1780, 1997 WL 22886, at *2 (D.D.C. Jan. 10, 1997) (granting more than four-year stay because "the FBI has shown that even though it is exercising due diligence, because of inadequate resources it is unable to respond to plain-tiff's request within the statutory [] limit").

Second, the Court concludes that the FBI has dem-onstrated the "due diligence" necessary to substantiate an *Open America* stay. Plaintiff's request, which covers more than 5,000 pages, is certainly a "large request" as defined by the FBI, as it stretches beyond 2,500 pages. See U.S. DEPARTMENT OF JUSTICE FREEDOM OF INFORMATION ACT (FOIA) REPORT FOR FISCAL YEAR 2003, Compliance With Time Limits/Status of Pending requests, *available at* http://www.usdoj.gov/oip/annual_report/2003/03contents .htm. It is not surprising that large requests such as the present one take additional amounts of time. *See, e.g., Jimenez v. Fed. Bureau of Investigation*, 938 F. Supp. 21, 24, 31-32 (D.D.C. 1996) [*17] (issuing *Open America* stay until March 2000, five years after request filed, so FBI could process 700 pages); *Ohaegbu v. Fed. Bureau of Investigation*, 936 F. Supp. 7, 8 (D.D.C. 1996) (grant-ing stay until July 1997, over three years after request filed, to permit FBI to process 175 pages); *Cecola v. FBI*, 1995 U.S. Dist. LEXIS 13253, Civ. No. 94-4866, 1995 WL 549066, at *1-*2 (N.D.Ill. Sept. 8, 1995) (dismissing case without prejudice to permit FBI until November 1999 to complete processing of over 1,500 pages respon-sive to a request filed over six years before). Moreover, it is clear that the FBI has been exercising "due diligence" vis-a-vis FOIA requests in general. The substantial re-

2005 U.S. Dist. LEXIS 18876, *

duction in the FBI's backlog is attributable to an increase in manpower, the introduction of certain on-line and computerized processing techniques to reduce delays, and the adoption of a new three-queue first-in, first-out system. *See* Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") PP 15-16. This new three-tiered system, which replaced the two-track, first-in, first-out system that the D.C. Circuit previously recognized as supporting a "due diligence" argument, *see* [*18] *Open America*, 547 F.2d at 616, has greatly increased the overall efficiency of the FBI's response system. *See* Defs.' Mot. to Stay, Ex. A ("Gehle Decl.") P 19.

The FBI's general "due diligence" extends to the processing of Plaintiff's request. As noted previously, the 5,000 pages of documents associated with the classified contract must go through a review by the CU to determine the applicability of Exemption (b)(1), then must be reviewed by the DRC. *Id.* P 24. As of September 23, 2004, nine FOIA paralegals were working on Plaintiff's request, and reviewed over 3,500 pages at that early time. *Id.* P 25. After DRC review, the CU will apply the DRC's classification decisions and complete the (b)(1) work on the documents. *Id.* P 24. After this, the Disclosure Unit will be required to conduct page-by-page, line-by-line review of the information to determine if any exemptions other than Exemption (b)(1) might apply. *Id.* Given this system, the real improvements made, and the FBI's stated progress, the Court finds that the efforts made by the FBI constitute the "due diligence" necessary for the imposition of an *Open America* stay. As such, the Court is "satisfied [*19] that [the FBI] is doing the best it can do within its physical limitations to process all

requests in a timely manner." *Freeman v. U.S. Dep't of Justice*, 822 F. Supp. 1064, 1066 (S.D.N.Y. 1993); *see also Ohaegbu*, 936 F. Supp. at 8 ("In view of this two-track system and the large volume of documents expected to be responsive to plaintiff's request, this Court finds that the FBI has met the due diligence requirement for a stay.").

**IV: CONCLUSION**

For the reasons set forth above, the Court shall grant Defendants' Motion for an *Open America* Stay until August 31, 2005, as requested. An Order accompanies this Memorandum Opinion.

Date: August 31, 2005

  COLLEEN KOLLAR-KOTELLY

  United States District Judge

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 31st day of August, 2005, hereby

**ORDERED** that [39] Defendants' Motion for an *Open America* Stay until August 31, 2005, is GRANTED.

**SO ORDERED.**

  COLLEEN KOLLAR-KOTELLY

  United States District Judge