**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ELECTRONIC FRONTIER FOUNDATION,

                Plaintiff,

         v.                       Civil No. 06-1708 (CKK)

DEPARTMENT OF JUSTICE,

                Defendant.
_____

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case involves a Freedom of Information Act ("FOIA") request that Plaintiff, the Electronic Frontier Foundation ("EFF" or "Plaintiff"), submitted to the Federal Bureau of Investigation ("FBI"), seeking "disclosure of records concerning DCS-3000 and Red Hook, which are tools the Bureau has developed to conduct electronic surveillance." Dkt. No. 1, ¶ 1. Defendant United States Department of Justice ("Defendant") moves the Court to enter summary judgment in Defendant's favor pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

As outlined in this memorandum and in the attached Eighth Declaration of David M. Hardy, the FBI conducted a thorough search to identify documents responsive to Plaintiff's requests and has released all responsive documents to Plaintiff except for certain documents or portions of documents withheld based on FOIA Exemptions 1, 2, 5, 6, 7(C) and 7(E). The FBI's application of these statutory exemptions was proper, and the FBI processed and released all reasonably segregable information. Accordingly, the Court should grant summary judgment in favor of the Defendant.

## **BACKGROUND**

DCS-3000 and Red Hook were developed by the FBI as interim solutions to allow law enforcement to conduct legally the electronic surveillance it needs when certain technologies are not covered by Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. §§ 1001 et seq., or when a covered technology is not CALEA-compliant.  Eighth Declaration of David M. Hardy ("Eighth Hardy Decl.") ¶ 26.  The FBI developed the DCS-3000 as "an interim solution . . . to intercept personal communications services delivered via emerging digital technologies used by wireless carriers in advance of any CALEA solutions being deployed."  Id. Law enforcement continues to use this technology as carriers continue to introduce—and criminals continue to utilize—new communication methods, features and services.  See id. ¶¶ 26-27.  Red Hook is a "system developed by the FBI to collect voice and data calls and then process and display the intercepted information in the absence of a CALEA solution."  Id.  ¶ 26. Both of these systems are "used to facilitate the collection of communications which are then used in furtherance of the FBI's counterterrorism, counterintelligence and investigative efforts." Id. ¶ 27.

## I.      **PLAINTIFF'S FOIA REQUESTS**

### A.      **Plaintiff's Request**

By letter dated August 11, 2006, Plaintiff submitted a FOIA request to the FBI.  Eighth Hardy Decl. ¶ 5.  Plaintiff's request sought "all agency records (including, but not limited to, electronic records) concerning electronic surveillance systems known as DCS-3000 and Red Hook," including "any reports made by the FBI to Congress on the Bureau's use of these technologies."  Id. ¶ 5, Ex. A.

**B.**     **The FBI's Response**

By two letters dated August 22, 2006, FBI Headquarters ("FBIHQ") acknowledged

receipt of Plaintiff's FOIA request and notified Plaintiff that the request for DCS-3000 and Red

Hook had been assigned FOIA/Privacy Act Request Numbers 1056287-000 and 1056307-000,

respectively.  Id. ¶ 6, Ex. B.  The FBI then conducted a search of its Central Records System for

documents responsive to the Plaintiff's FOIA requests.  See id. ¶¶ 7-8.  By letter dated August

30, 2006, FBIHQ advised Plaintiff that a search of the automated indices to the FBI's Central

Records System located no main Headquarters files responsive to Plaintiff's DCS-3000 request.

Id. ¶ 7, Ex. C.; see also First Hardy Decl. ¶ 29-34 (Dkt. No. 7, Ex 1) (further describing the

search).  A similar FBIHQ search for Plaintiff's Red Hook request located one main

Headquarters file.  Eighth Hardy Decl. ¶ 7 n.5.[1]

In addition to initiating a standard search of records in the Central Records System, the

FBI also conducted an individualized inquiry of the most logical divisions and offices at FBIHQ

that could have potentially responsive records, including unserialized copies and e-mails

responsive to Plaintiff's request.  First Hardy Decl. ¶ 37 (Dkt. No. 7, Ex 1).  The FBI's

Record/Information Dissemination Section ("RIDS") prepared and circulated an Electronic

Communication to those FBIHQ offices most likely to possess potentially responsive documents,

which directed each office to conduct a search of their records for that potentially response

material.  Id.; Eighth Hardy Decl. ¶ 7 n.6.

These steps identified approximately 20,000 pages potentially responsive to Plaintiff's

---

[1]  For administrative convenience purposes, although initially assigned two FOIA request numbers, the two requests were combined into one search and were treated as if they were one request.  First Hardy Decl. ¶ 37 n.13 (located at Dkt. No. 7, Ex. 1).

FOIA request.  Eighth Hardy Decl. ¶ 8.  Plaintiff was notified of this large volume of documents,

and by letter dated January 9, 2007, FBIHQ provided Plaintiff with documentation of a

telephone conversation between a RIDS employee and Plaintiff's counsel, Marcia Hofmann,

reiterating that:  (a) the records found to be responsive to Plaintiffs' requests totaled

approximately 20,000 pages; and (b) the FBI, in discussions with Ms. Hofmann, attempted to

narrow the scope of the request in order to reduce the numbers of potentially-responsive records,

thereby accelerating the processing of Plaintiff's request, but these efforts were unsuccessful.  Id.

¶ 8, Ex. D.

## II.    LITIGATION HISTORY AND THE FBI'S PROCESSING OF RESPONSIVE DOCUMENTS

Plaintiff filed its Complaint in this case on October 3, 2006.  Dkt. No. 1.  Because

exceptional circumstances prevented the FBI from processing Plaintiff's requests within the

statutory time limit, and based on the large volume of records identified as potentially

responsive, Defendant sought a stay of this litigation for twenty-seven months pursuant to 5

U.S.C. § 552(a)(6)(C) and Open America v. Watergate Special Prosecution Force, 547 F.2d 605

(D.C. Cir. 1976).  See Dkt. No. 7 (Mem. in Support of Def's Mtn. for Open America Stay).

Plaintiff opposed Defendant's motion for a stay.  See Dkt. No. 12 (Pl.'s Opposition to Def's Mtn.

for Open America Stay).

On May 7, 2007, this Court issued an order granting Defendant's motion for a stay until

May 9, 2008, with an option to extend the stay if "Defendant believe[d] such an extension [was]

warranted."  Dkt. No. 15.  The Court further instructed Defendant to (1) make interim releases of

records responsive to Plaintiff's FOIA request every four weeks; and (2) file periodic reports

every ninety days indicating the FBI's progress in processing documents responsive to Plaintiff's

request.  See id. at 1-2.

Defendant continued processing Plaintiff's FOIA request during the pendency of the stay.
Between June 4, 2007 and February 11, 2008, the FBI made ten interim releases of documents to
the Plaintiff.  See Eighth Hardy Decl. ¶ 10, Exs. E-N.  These releases together accounted for a
total of approximately 7,920 pages reviewed, of which 5,245 were released to Plaintiff in full or
in part.  Eighth Hardy Decl. ¶ 4.[2]  In accordance with the Court's instructions, Defendant advised
the Court of these releases in periodic status reports filed on August 5, 2007, November 5, 2007,
February 1, 2008 and May 1, 2008.  See Dkt. Nos. 17, 19-21.

As reflected in Joint Status Reports dated May 29 and July 11, 2008, the parties
conferred on multiple occasions regarding the possibility of narrowing the scope of litigation, but
ultimately could not reach an agreement on how to proceed.  See Dkt. Nos. 22-23.  Specifically,
the parties were unable to reach agreement on the scope of a Vaughn index (or its equivalent).[3]
While Plaintiff requested that Defendant prepare "preliminary" and comprehensive Vaughn
indices describing each of the 679 withheld pages and the bases for the withholdings, Defendant
proposed a representative Vaughn index based on an agreed-upon sample of the documents.

_____

[2]  The remainder of the approximately 20,000 pages that had earlier been identified as
potentially responsive to Plaintiff's FOIA requests were eliminated as not responsive.  Eighth
Hardy Decl. ¶ 4.  10,314 remaining pages then underwent further review, of which 2,394 pages
were determined by RIDS to be outside the scope of the request.  Id.  Of the 7,920 responsive
pages that were processed in this case, 5,245 pages were released to Plaintiff and 2,675 pages
were withheld in full (including 293 pages withheld as duplicates).  Id.  This page count includes
corrections made during the litigation stage, where it was discovered that 27 additional pages
were incorrectly marked as duplicates during processing.  Id. n.3.

[3]  A Vaughn index is an itemized index and/or declaration that describes the withheld
documents and explains why each withheld record is exempt from disclosure.  Vaughn v. Rosen,
484 F.2d 820, 826-28 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974).

Compare Dkt. No. 25 at 7-8 (Pl.'s Sampling Mem.), with Dkt. No. 24 at 6-9 (Def.'s Sampling Mem.). Defendant believed that the latter Vaughn would provide Plaintiff with ample opportunity to contest the bases for the exemptions as well as promote judicial efficiency and economy by reducing the exemption issues to a manageable size, thereby permitting the Court to extrapolate its conclusions from the representative sample to the larger group of withheld materials.

On August 7, 2008, after oral argument on this matter, the Court ordered Defendant to produce to Plaintiff a new package of all previously released documents with Bates numbers added, along with a list of all documents withheld in whole or in part. See Minute Order of Aug. 7, 2008. The Court further instructed the parties to confer regarding the possibility of narrowing the number of documents at issue. Id. Shortly thereafter, Defendant provided Plaintiff with Bates-labeled pages and a list of all withheld documents as ordered by the Court, and on September 29, 2008, the parties informed the Court that it had reached an agreement on how to proceed in the case. See Dkt. No. 27. Specifically, the parties agreed that the litigation should proceed based on a representative sample of documents, and that the parties would select approximately 800 pages to comprise the representative sample of pages withheld in full or in part, covering approximately ten percent of the disputed material. Id.[4]

On March 31, 2009, Defendant provided Plaintiff with the Vaughn material for this case, which consists of a detailed Vaughn declaration as well as copies of the 762 Vaughn-coded

---

[4] It was later decided by the parties that Plaintiff would select the documents to be used as the representative sample to be litigated in this case. Plaintiff selected 762 such pages for inclusion in the Vaughn index that accompanies this Memorandum. See Eighth Hardy Decl. ¶ 4 & n.4.

pages selected by Plaintiff as the representative sample (hereinafter "Vaughn Index").  See Dkt.

No. 30.[5]  After providing Plaintiff with additional time to review this material, the parties

conferred several times but were unable to reach agreement on how to narrow the legal claims

made in this case.  See Dkt. No. 31.  Upon considering the parties' respective positions in their

Joint Status Report of May 18, 2009, see Dkt. No. 31, the Court adopted Defendant's scheduling

proposal and instructed the parties to propose a schedule for dispositive motions, which the

parties provided to the Court on June 12, 2009.  See Minute Order of May 29, 2009, and Dkt.

No. 32 (Joint Mtn. for Order Setting Briefing Schedule).  As agreed to by the parties, Defendant

now moves for summary judgment on the remaining issues in this case.

## ARGUMENT

## I.   STATUTORY FRAMEWORK AND STANDARD OF REVIEW

### A.   FOIA Cases Generally

The FOIA, 5 U.S.C. § 552, "represents a balance struck by Congress between the

public's right to know and the government's legitimate interest in keeping certain information

confidential."  Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing

John Doe Agency v. John Doe Corp., 493 U.S. 146 (1989)).  While the FOIA requires agency

disclosure under certain circumstances, it also recognizes "that public disclosure is not always in

the public interest."  Baldridge v. Shapiro, 455 U.S. 345, 352 (1982).  Accordingly, the statute

---

[5]  The Seventh Declaration of David M. Hardy was provided to Plaintiff on March 31, 2009, but not filed with the Court.  See Dkt. No. 30, ¶ 3.  However, the Eighth Declaration of David M. Hardy, which accompanies Defendant's instant motion, is simply a re-executed version of the Seventh Declaration that contains updated administrative information and only slight page count corrections made during the litigation stage.  There are no substantive differences between the Eighth Hardy Declaration and that provided to Plaintiff on March 31, 2009.

requires agencies to release documents responsive to a properly submitted request but also

provides nine statutory exemptions to this general disclosure obligation.  See 5 U.S.C. §§

552(a)(3), (b)(1)-(b)(9).  While the nine exemptions should be "narrowly construed," FBI v.

Abramson, 456 U.S. 615, 630 (1982), the Supreme Court has made clear that courts must give

them "meaningful reach and application."  John Doe Agency, 493 U.S. at 152.

        Typically, FOIA cases should be resolved on motions for summary judgment.  See

Harrison v. EOUSA, 377 F. Supp. 2d 141, 145 (D.D.C. 2005) (Lamberth, J.).  Courts review de

novo the agency's use of a FOIA exemption to withhold documents.  Wolf v. CIA, 473 F.3d 370,

374 (D.C. Cir. 2007).  To sustain its burden of justifying nondisclosure of information, see 5

U.S.C. § 552(a)(4)(B), the agency must provide a declaration identifying the information at issue

and the bases for the exemptions claimed.  See Summers v. DOJ, 140 F.3d 1077, 1080 (D.C. Cir.

1998).  Agency declarations and indices are accorded presumptions of good faith, SafeCard

Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and expertise, Piper v. DOJ, 294 F.

Supp. 2d 16, 20 (D.D.C. 2003) (Lamberth, J.).  "[S]ummary judgment is warranted on the basis

of agency affidavits when the affidavits describe the justifications for nondisclosure with

reasonably specific detail . . . and are not controverted by either contrary evidence in the record

nor by evidence of agency bad faith."  Wolf, 473 F.3d at 374 (internal quotation marks omitted)

(omission in original).  "Ultimately, an agency's justification for invoking a FOIA exemption is

sufficient if it appears 'logical' or 'plausible.'"  Id. at 374-75.

        B.        **FOIA Cases Involving National Security**

        In evaluating the applicability of FOIA exemptions for purposes of deciding the instant

motion, the Court should be mindful that the information sought by Plaintiff "implicat[es]

national security, a uniquely executive purview." Ctr. for Nat'l Sec. Studies, 331 F.3d at 926-27

(applying a "measure of deference to the executive" with respect to information withheld under

Exemption 7); see also Larson v. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009) ("Today we

reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of

national security." (citation omitted)).   "Indeed, both the Supreme Court and [D.C. Circuit] have

expressly recognized the propriety of deference to the executive in the context of FOIA claims

which implicate national security." Id. at 927-28; see also Ctr. for Nat'l Sec. Studies, 331 F.3d

at 927 ("'terrorism or other special circumstances'" may warrant "'heightened deference to the

judgments of the political branches'" (quoting Zadvydas v. Davis, 533 U.S. 678, 696 (2001))).

Accordingly, courts have repeatedly emphasized that "weigh[ing] the variety of complex

and subtle factors in determining whether disclosure of information may lead to an unacceptable

risk of compromising the [Nation's] intelligence-gathering process" is a task best left to the

Executive Branch, not the judiciary. CIA v. Sims, 471 U.S. 159, 180 (1983); see Ctr. for Nat'l

Sec. Studies, 331 F.3d at 928 ("[T]he judiciary is in an extremely poor position to second-guess

the executive's judgment in [the] area of national security."); Larson, 565 F.3d at 865 (same);

Krikorian, 984 F.2d at 464 ("Judges . . . lack the expertise necessary to second-guess such

agency opinions in the typical national security FOIA case." (internal quotation marks omitted)).

For this reason, the D.C. Circuit has recently and "consistently deferred to executive affidavits

predicting harm to the national security, and have found it unwise to undertake searching judicial

review." Larson, 565 F.3d at 865 (internal quotation marks omitted).

Therefore, "in conducting de novo review in the context of national security concerns,

courts must accord substantial weight to an agency's affidavit concerning the details of the

classified status of the disputed record." <u>Wolf</u>, 473 F.3d at 374 (internal quotation marks omitted); <u>see also</u> <u>Krikorian</u>, 984 F.2d at 464 (noting deference to expertise of agencies engaged in national security and foreign policy).  In according such deference, "a reviewing court 'must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm.'" <u>Wolf</u>, 473 F.3d at 374 (quoting <u>Halperin</u>, 629 F.2d at 149).

## II.    THE FBI CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DOCUMENTS

To demonstrate the adequacy of a search, an agency must "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  <u>Oglesby v. Dep't of the Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990).  An adequate search does not mean that every conceivable responsive document will be discovered.  <u>See id.</u> ("There is no requirement that an agency search every record system."); <u>Allen v. United States Secret Serv.</u>, 335 F. Supp. 2d 95, 99 (D.D.C. 2004) (Sullivan, J.) ("While the agency's search must be reasonably calculated to produce the requested information, FOIA does not impose a requirement that *every* record be found.").  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." <u>Weisberg v. DOJ</u>, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

In evaluating the adequacy of a search, courts accord agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" <u>SafeCard Servs.</u>, 926 F.2d at 1200.  The statute does not require "meticulous documentation [of] the details of an epic search." <u>Perry v. Block</u>, 684 F.2d

121, 127 (D.C. Cir. 1982).  Instead, declarations that "explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA."  Id.

In this case, the FBI's search was reasonably calculated to uncover all documents responsive to EFF's FOIA requests.  As explained in the First Declaration of David M. Hardy, the FBI employed two search methods to identify documents responsive to Plaintiff's requests.  See First Hardy Decl. ¶¶ 35-37.  First, on August 28, 2006, RIDS conducted a standard search of records in FBI's Central Records System, which consists of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes.  Eighth Hardy Decl. ¶¶ 7-8; First Hardy Decl. ¶¶ 29, 35-36.  This search employed the terms "DCS 3000" and "Red Hook," and sought both main files and cross-references.  First Hardy Decl. ¶ 36.  The date parameters for the search were for any responsive records created on or before the date of the search, August 28, 2006.  Id.

The second search method that FBI employed was an individualized inquiry of the most logical offices at FBIHQ that could have documents potentially responsive to Plaintiff's FOIA request.  Id. ¶¶ 35, 37.  As explained in the First Declaration of David M. Hardy, RIDS prepared and circulated an Electronic Communication to the FBIHQ divisions and offices most likely to possess potentially responsive records, including the "Critical Incident Response Group, Criminal Justice Information Services, Counterintelligence, Counterterrorism, Criminal Investigative, Cyber, Directorate of Intelligence, Office of the General Counsel, Inspection, Information Technology Program Management, Operational Technology, Law Enforcement Coordination, and Records Management Divisions."  Id.  The Electronic Communication

directed each office to conduct a search of their records for that potentially response material,

and requested that all personnel in those offices conduct a thorough search of documents in their

possession, including unserialized copies and e-mails, for any responsive records.  Eighth Hardy

Decl. ¶ 7 n.6.

This was a thorough and adequate search that used "methods which can be reasonably

expected to produce the information requested."  Oglesby, 920 F.2d 57 at 68.  The steps the FBI

took to locate the information sought by Plaintiff, as documented in detail in the First

Declaration of David M. Hardy, met Defendant's obligations under the FOIA.

## III.   THE FBI PROPERLY WITHHELD INFORMATION THAT IS EXEMPT UNDER THE FOIA

The FBI processed the responsive records in accordance with the FOIA and withheld

certain information pursuant to FOIA exemptions 1, 2, 5, 6, 7(C) and 7(E), as explained in detail

below and in the attached Eighth Declaration of David M. Hardy.  The FBI properly invoked

these exemptions, and processed and released all reasonably segregable information from the

responsive records.  Accordingly, Defendant is entitled to summary judgment.

### A.      The FBI Processed and Released All Reasonably Segregable Information from the Responsive Records

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be

provided to any person requesting such record after deletion of the portions which are exempt

under this subsection."  5 U.S.C. § 552(b).  This provision does not require disclosure of records

in which the non-exempt information that remains is meaningless.  See Nat'l Sec. Archive Fund,

Inc. v. CIA, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (Collyer, J.) (concluding that no

reasonably segregable information exists because "the non-exempt information would produce

only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words").

As required by the FOIA, the FBI has provided all "reasonably segregable" responsive information that is not protected by an exemption.  5 U.S.C. § 552(b).  The FBI processed all documents "to achieve maximum disclosure consistent with the access provisions of the FOIA," and made every effort "to provide Plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material."  Eighth Hardy Decl. ¶¶ 11, 55.  No reasonably segregable, nonexempt portions were withheld.  See id. ¶ 11.  The FBI indicated where any material was withheld in the documents it released to Plaintiff and provided coded categories to indicate the nature of any information withheld.   See id. ¶¶ 12-13.  All the material the FBI withheld is exempt from disclosure pursuant to FOIA exemptions or is so intertwined with protected material that segregation is not possible without revealing the very information that is exempt from disclosure.  See id. ¶ 12.

### B.      The FBI Properly Withheld Information Pursuant to FOIA Exemption 1

The FBI properly withheld classified information pursuant to section 552(b)(1) of the FOIA ("Exemption 1").[6]  Exemption 1 protects records that are:  "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive

---

[6]  The FBI invoked Exemption 1 on the following Bates-numbered pages within the representative sample:  DCS-3000 1542, 2847, 3443, 3460, 5280, 5282-83, 5285-86, 5489, 7525, 7711-16, 7726, 7728-33, 7779-7801, 7867-68, 7882-83, 7885, and 7887.

order." 5 U.S.C. § 552(b)(1).  Section 1.1(a)(4) of Executive Order 12958[7] states that an agency

may classify information that fits into one or more of the Executive Order's categories for

classification when the appropriate classification authority "determines that the unauthorized

disclosure of the information reasonably could be expected to result in damage to the national

security."  Exec. Order No. 12958, § 1.1(a)(4).

　　　An agency can demonstrate that it has properly withheld information under Exemption 1

if it establishes that it has met the requirements of the Executive Order.  Substantively, the

agency must show that the records at issue logically fall within the exemption—i.e., that

Executive Order 12958 authorizes the classification of the information at issue.  Procedurally,

the agency must demonstrate that it followed the proper procedures in classifying the

information.  See Salisbury v. United States, 690 F.2d 966, 970-73 (D.C. Cir. 1982); Military

Audit Project v. Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981).  An agency meeting both tests is

entitled to summary judgment.  See, e.g., Abbotts v. Nuclear Regulatory Comm'n, 766 F.2d 604,

606-08 (D.C. Cir. 1985); Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984).

　　　Agency decisions to withhold classified information under the FOIA are reviewed de

novo by the district court, and the agency bears the burden of proving its claim for exemption.

See 5 U.S.C. § 552(a)(4)(B); Miller, 730 F.2d at 776.  Nevertheless, because agencies have

"unique insights" into the adverse effects that might result from public disclosure of classified

information, courts must accord "substantial weight" to an agency's affidavits justifying

---

[7] Executive Order 12958 was amended by Executive Order 13292, effective March 25,
2003.  See Exec. Order No. 12958, 3 C.F.R. (1995), reprinted as amended in 50 U.S.C. § 435
note; see also Exec. Order No. 13292, 68 Fed. Reg. 15,315 (Mar. 28, 2003).  All citations herein
to Executive Order 12958 are to the Order as amended by Executive Order 13292.

classification.  <u>Military Audit Project</u>, 656 F.2d at 738 (emphasis omitted); <u>cf. Miller</u>, 730 F.2d

at 776 (noting that court must "accord substantial weight to an agency's affidavit concerning the

details of the classified status of the disputed record").  "[T]he court is not to conduct a detailed

inquiry to decide whether it agrees with the agency's opinions."  <u>Halperin v. CIA</u>, 629 F.2d 144,

148 (D.C. Cir. 1980); <u>see</u> <u>Weissman v. CIA</u>, 565 F.2d 692, 697 (D.C. Cir. 1977) ("Few judges

have the skill or experience to weigh the repercussions of disclosure of intelligence

information.").

     The relevant Executive Order currently in effect is Executive Order 12958, as amended,

"Classified National Security Information."  An agency can demonstrate that it has properly

withheld information under Exemption 1 if the agency establishes that it has met the substantive

and procedural requirements of Executive Order 12958.  Pursuant to § 1.1(a) of Executive Order

12958 (as amended), information may be classified if:

    (1)    an original classification authority is classifying the information;

    (2)    the information is owned by, produced by or for, or is under the control of
         the United States Government;

    (3)    the information falls within one or more of the categories of information
         listed in section 1.4 of [the Executive Order]; and

    (4)    the original classification authority determines that the unauthorized
         disclosure of the information reasonably could be expected to result in
         damage to the national security, which includes defense against
         transnational terrorism, and the original classification authority is able to
         identify or describe the damage.

Exec. Order No. 12958, § 1.1(a).  Procedurally, the agency must ensure that:

    (1)    each document is marked as required and stamped with the proper
         classification designation, Exec. Order No. 12958, § 1.6(a);

    (2)    each document is marked to indicate clearly which portions are classified,

which portions are exempt from declassification as set forth in Executive Order No. 12958, § 1.5(b), and which portions are unclassified, Exec. Order No. 12958, § 1.6(c);

(3)     the prohibitions and limitations on classification specified in Executive Order No. 12958, § 1.7, are adhered to;

(4)     the declassification policies set forth in Executive Order No. 12958, §§ 3.1 and 3.3, are followed; and

(5)     any reasonably segregable portion of the classified documents are declassified and marked for release, unless withholding is otherwise warranted under the law.

Id. §§ 1.5-1.7, 3.1, 3.3.

In this case, the Eighth Declaration of David M. Hardy demonstrates that the FBI has adhered to the mandated procedures in determining that the information withheld under Exemption 1 is classified.  See Eighth Hardy Decl. ¶¶ 18-23.  The Attorney General has designated Mr. Hardy as an original classification and declassification authority.  See Exec. Order No. 12958, §§ 1.3, 3.1; Eighth Hardy Decl. ¶ 2.  The classified information, which is under the control of the United States Government, contains information relating to intelligence activities, sources or methods, system capabilities and/or vulnerabilities, and foreign relations or foreign activities of the United States.  See Exec. Order No. 12958, § 1.4(c), (d), (g); Eighth Hardy Decl. ¶¶ 19, 23.  Mr. Hardy has determined that release of this information could cause serious damage to the national security of the United States as described in more detail below. See id. ¶¶ 19-23.  Mr. Hardy made certain that all of the procedural and administrative requirements of Executive Order 12958 were followed, including proper identification and marking of documents.  See id. ¶ 18.

## 1.     Intelligence Activities, Sources and Methods

Much of the classified information withheld relates to intelligence activities, sources and methods.  See id. ¶¶ 19-20.[8]  Information that reveals intelligence activities, sources or methods is exempt from disclosure pursuant to section 1.4(c) of Executive Order 12958 (as amended) and FOIA Exemption 1.  As detailed in the accompanying Eighth Declaration of David M. Hardy, the FBI withheld classified information identifying the names and/or the descriptions of systems at issue that are methods used by the FBI to "gather, store, or disseminate intelligence information."  Eighth Hardy Decl. ¶ 20 ("The classified information obtained from this system is very specific in nature and known to very few individuals.").  Disclosure of this information would "inform hostile intelligence entities of the possible range of [the United States'] intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or can collect, concerning them."  Id.  Disclosure would also permit violators to piece together information to determine the actual intelligence activities, sources, and methods used in FBI investigations.  Id.  This would provide actual or potential lawbreakers a means to circumvent the national security laws of the United States and allow countermeasures to be developed, "making future operations more difficult, or compromise other ongoing planned intelligence operations."  Id.  Disclosure would therefore hamper the effectiveness of the intelligence gathering methods at issue and "cause serious damage to national security."  Id.

### 2.    Foreign Relations or Foreign Activities of the United States

The classified systems and descriptive data identified on Bates-numbered page DCS-3000 1542 also relates to foreign relations or foreign activities of the United States, and is

---

[8] This includes the following Bates-numbered pages within the representative sample: DCS-3000 1542, 2847, 3443, 3460, 5280, 5282-86, 5489, 7525, 7711, 7712, 7714-16, 7726, 7728, 7729, 7730-33, 7779-81, 7867, 7868, 7882, 7883, 7885, and 7887.

exempt from disclosure under section 1.4(d) of Executive Order 12958 (as amended) and FOIA Exemption 1. The systems and descriptive data identified on that record contain sensitive information gathered by the United States either about or from a foreign country. See Eighth Hardy Decl. ¶ 21. The delicate liaison between the United States and these foreign governments could be severely damaged if the United States were to disclose these investigations. See id. As explained in the Eighth Declaration of David M. Hardy, unauthorized disclosure of such information can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope, or time frame of U.S. intelligence activities in or concerning a foreign country; enable hostile entities to assess U.S. intelligence-gathering activities and devise countermeasures against those activities; or compromise cooperative foreign sources. See id.

### 3.      Vulnerabilities or Capabilities of Systems

Classified information in many of the documents listed above has also been withheld under section 1.4(d) of Executive Order 12958 and FOIA Exemption 1 in order to protect the capabilities and/or vulnerabilities of the DCS-3000 and other similar systems from disclosure.[9] This information is chronicled in the e-mails of FBI employees, documented in charts and graphs, and discussed in detail in the various training manuals and similar documents contained in the instant FOIA release. See Eighth Hardy Decl. ¶ 22. Disclosure of this information would provide a potential criminal or terrorist "a roadmap on how to evade the detection of illegal activity" and "where and how to attack these [FBI] systems." See id. The release of these data

---

[9] This includes the following Bates-numbered pages within the representative sample: DCS-3000 1542, 2847, 3460, 5280, 5282, 5283, 5285, 5286, 5289, 7525, 7711, 7712, 7714-16, 7726, 7728 and 7731-33.

processes, systems designs and systems applications could result in vulnerabilities to future security attacks and invasions in the United States.  See id.

In sum, the Eighth Declaration of David M. Hardy explicates in great detail how disclosure of the above-listed information could reasonably be expected to cause serious damage to the national security of the United States.  Accordingly, based on its detailed declaration and the absence of any evidence of bad faith, the FBI has properly withheld information pursuant to FOIA Exemption (b)(1).

## C.     The FBI Properly Withheld Information Pursuant to FOIA Exemption 2

The FBI also properly withheld certain internal information pursuant to section 552(b)(2) of the FOIA ("Exemption 2").  Information that is "related solely to the internal personnel rules and practices of an agency" is exempt from disclosure pursuant to Exemption 2.  5 U.S.C. § 552(b)(2).  Exemption 2 applies to materials "'used for predominantly internal purposes.'" Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (quoting Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (en banc)).  This exemption has been held to protect:  (1) information that, if released, would risk circumvention of agency regulations or statutes, see Crooker, 670 F.2d at 1074; and (2) "routine matters of merely internal interest," id. at 1069 (citation omitted).  The first category of information is protected under the so-called "high 2" exemption, while the second category is protected under the "low 2" exemption.  See Schiller, 964 F.2d at 1207; Wiesenfelder v. Riley, 959 F. Supp. 532, 535 (D.D.C. 1997) (Harris, J.).   In this case, the FBI has properly withheld information from both categories.

1.    **The FBI Properly Withheld Internal System Information Pursuant to FOIA Exemption 2 (High)**

The FBI withheld data source, data process, computer application, and systems design information related to the DCS-3000 and similar or related systems pursuant to Exemption 2 (High).[10]  The types of documents for which Exemption 2 (High) is claimed can be grouped into three primary categories.  The first group consists of policy, planning, and operations documents that contain system design details for the DCS-3000, "including access to data, data attributes, and administrative procedures, development, capabilities and vulnerabilities of the system, and training materials and manuals for operation of the DCS-3000."  See Eighth Hardy Decl. ¶ 29. The second category consists of FBI internal e-mails that contain, for example, "discussion of proposed and existing sources of information, methods of gathering information, draft Privacy Threshold Analyses, and DCS-3000 design, processes and applications."  Id. ¶ 30.  A third category includes other miscellaneous documents, such as legal opinions and analysis, transition plans, and printouts from the DCS-3000.  Id. ¶ 31.

Exemption 2 (High) permits the withholding of information relating to the nature and

---

[10]  The FBI asserted Exemption 2 (High) in withholding data source, data process, computer application, and systems design information related to the DCS-3000 and similar systems on the following Bates-numbered pages within the representative sample:  DCS-3000 3-6, 11, 232, 964, 966, 1198, 1252, 1386, 1417, 1455, 1459-60, 1542, 1605-09, 1667, 1713, 1761, 1882-84, 1957, 2034, 2074-78, 2207, 2846-47, 3131-32, 3138, 3443, 3452-53, 3459-60, 3494-95, 3520-24, 3569-70, 3572-73, 3582, 3584, 3586, 3599-3603, 3605-12, 3614, 3621-28, 3632-33, 3639, 3641-42, 3683-96, 3749-52, 3758-61, 3769-76, 3805-26, 3841-69, 3929-42, 3987-4011, 4087-4122, 4193-4230, 4232, 4235-36, 4241-55, 4257-58, 4261-65, 4268-71, 4274-75, 4277-79, 4281, 4344-49, 4730-35, 4975-77, 5061, 5063-64, 5069-79, 5087-94, 5104, 5106-09, 5112-13, 5116-31, 5135-42, 5144-48, 5153-54, 5156-5201, 5203, 5208, 5210-12, 5214, 5220-31, 5233-39, 5242, 5244-54, 5256, 5259-67, 5269, 5272-76, 5278, 5280-86, 5489-95, 5497-5503, 5522, 7524-25, 7527-33, 7535-40, 7542-44, 7546-49, 7551-53, 7555, 7711-16, 7721-33, 7779-7801, 7809-17, 7821-24, 7840, 7847 and 7859-7888.

identity of information sources used in law enforcement and national security activities when release of the information could help criminals evade detection.  See, e.g., PHE, Inc. v. DOJ, 983 F.2d 248, 251 (D.C. Cir. 1993) (holding that Exemption 2 authorized withholding of information relating to the "specific documents, records and sources of information available to [FBI] Agents" and concluding that "release of FBI guidelines as to what sources of information are available to its agents might encourage violators to tamper with those sources of information and thus inhibit investigative efforts"); Dorsett v. Dep't of Treasury, 307 F. Supp. 2d 28, 36 (D.D.C. 2004) (Walton, J.) (same protection for information which "could be used to gain insight into the methods and criteria the Secret Service utilizes to identify and investigate persons of interest, and could alter such individuals' behavior to avoid detection"); Keys v. Dep't of Homeland Sec., 510 F. Supp. 2d 121, 127-28 (D.D.C. 2007) (Kay, M.J.) (similar).

A danger that disclosure of internal information may facilitate unauthorized intrusion into a system also amounts to a risk of circumvention justifying withholding under Exemption 2. See, e.g., Singh v. FBI, 574 F. Supp. 2d 32, 44-45 (D.D.C. 2008) (Lamberth, J.) (holding that Exemption 2 permitted agency to withhold information that could facilitate unauthorized access into computer systems used for investigations); Boyd v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 496 F. Supp. 2d 167, 171 (D.D.C. 2007) (Urbina, J.) (same); cf. Lewis-Bey v. DOJ, 595 F. Supp. 2d 120, 131 (D.D.C. 2009) (similar protection for ATF's "law enforcement[] and firearms tracing databases").

In the instant case, both requirements for invoking Exemption 2 (High) have been met. The above-described information withheld by the FBI relates to internal practices and procedures for the development and operation of the DCS-3000 and related systems, which have "become

necessary due to the fact that certain new and emerging technologies [used by terrorists and other criminals] are not covered by the Communications Assistance for Law Enforcement Act ('CALEA')," 47 U.S.C. §§ 1001 et seq.  Eighth Hardy Decl. ¶ 26.  The information is not "secret law," see Wiesenfelder, 959 F. Supp. at 535, "does not purport to regulate activities among members of the public," and does not "set standards to be followed by agency personnel in deciding whether to proceed against or to take action affecting members of the public." VoteHemp, Inc. v. DEA, 567 F. Supp. 2d 1, 20 (D.D.C. 2004) (Walton, J.) (internal quotation marks omitted).  Rather, the information is "used for predominantly internal purposes" and is therefore eligible for withholding under Exemption 2.

Furthermore, as explained in the attached Eighth Declaration of David M. Hardy, digital collection systems such as the DCS-3000 have become necessary to confront the increasing incidents committed and facilitated by terrorist and other criminals "using high-tech, non traditional communication methods."  Eighth Hardy Decl. ¶ 27.  Public knowledge of the data sources and types of sources of information available to and utilized by systems such as the DCS-3000 would enable individuals involved in criminal or terrorist activities to avoid using these methods of communication or otherwise adapt their activities to avoid detection.  Id. ¶ 32. Release of DCS-3000 data processes, systems designs and applications could result in serious vulnerabilities to cyber attacks and invasions by these potential violators, or otherwise facilitate unauthorized intrusions into or interference with the integrity of the DCS-3000.  Id.  Because release of this information could enable the circumvention of criminal laws, see Schiller, 964 F.2d at 1207, Defendant's assertion of Exemption 2 to withhold it is proper.

Additionally, as Exemption 7(E) provides an additional basis for withholding DCS-3000

data sources, data processes, systems design and applications.  See infra, § III.F.

> **2.     The FBI Properly Withheld FBI Internal Telephone Numbers, Fax Numbers, E-mail Addresses and Web Site Addresses Pursuant to FOIA Exemption 2 (Low)**

The FBI also properly invoked Exemption 2 (Low) in withholding internal telephone and fax numbers, e-mail addresses, and Web site addresses of FBI Special Agents and support personnel, as well as internal web pages used by various FBI Units for the transfer of information concerning systems design, processes, and applications related to DCS-3000.[11]

As explained in the attached Eighth Declaration of David M. Hardy, disclosure of contact and network information could subject FBI personnel to "harassing telephone calls or e-mails that could disrupt official business" by, for example, "impeding the ability of [FBI] Special Agents to conduct and conclude law enforcement investigations in a timely manner."  Eighth Hardy Decl. ¶ 33.  Such routine and administrative information is internal to the FBI, and its disclosure would not serve any public interest.  See id.

This court has repeatedly held that government telephone numbers, email addresses, and like information may be withheld pursuant to Exemption 2 under such circumstances.  See, e.g., Coleman v. Lappin, 607 F. Supp. 2d 15, 21 (D.D.C. 2009) (Collyer, J.); Antonelli v. Fed. Bureau of Prisons, 569 F. Supp. 2d 61, 65 (D.D.C. 2008) (Kollar-Kotelly, J.); Miller v. DOJ, 562 F. Supp. 2d 82, 110 (D.D.C. 2008) (Kennedy, J.).  Accordingly, the FBI properly withheld this information pursuant to Exemption 2.

---

[11]  The FBI asserted Exemption 2 (Low) in withholding internal telephone and fax numbers, e-mail addresses, and Web site addresses on the following Bates-numbered pages within the representative sample:  DCS-3000 5, 232, 1403a, 1455, 1459, 1609, 2033, 2074-75, 2077-78, 3132, 3443, 3452, 3496, 3519, 3573, 3582, 3584, 3586, 5060, 5080, 5094, 5117, 5142, 5154-55, 5213, 5219, 5277, 5490, 7809-17, 7821-24, 7840, 7847, 7859-67, 7869-87.

In conjunction with Exemption 2, the FBI also properly asserted Exemption 6 and 7(C) as an additional basis for withholding some of this information.  See infra, § III.E.

**D.      The FBI Properly Withheld Privileged Inter- and Intra-Agency Communications Pursuant to FOIA Exemption 5**

The FBI properly withheld all predecisional, deliberative, and otherwise privileged inter- and intra-agency communications pursuant to section 552(b)(5) of the FOIA ("Exemption 5"). Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  The exemption ensures that members of the public cannot obtain through FOIA what they could not ordinarily obtain through discovery in a lawsuit against the agency.  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).  It therefore covers "the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege." Rockwell Intern. Corp. v. DOJ, 235 F.3d 598, 601 (D.C. Cir. 2001).  Two of these privileges—the deliberative process privilege and attorney-client privilege—have been properly utilized by the FBI in this case.

**1.      The FBI Properly Withheld Information Pursuant to the Deliberative Process Privilege**

The deliberative process privilege applies to "decisionmaking of executive officials generally," and protects documents containing deliberations that are part of the process by which government decisions are formulated.  In re Sealed Case, 121 F.3d 729, 737, 745 (D.C. Cir. 1997).  The purpose of the deliberative process privilege is to encourage frank discussion of legal and policy issues within the government, and to protect against public confusion resulting from disclosure of reasons and rationales that were not ultimately the bases for the agency's

action. See, e.g., Mapother v. DOJ, 3 F.3d 1533, 1537 (D.C. Cir. 1993); Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982).  It is premised upon the notion that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process." Sears, Roebuck & Co., 421 US. at 150-51.

To come within the scope of the deliberative process privilege, a document must be both "predecisional and deliberative." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  A document is "predecisional" if "it was generated before the adoption of an agency policy" and "deliberative" if "it reflects the give-and-take of the consultative process." Id. (emphasis omitted).  The privilege therefore applies to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  Id.; see also Sears, Roebuck & Co., 421 U.S. at 150; Dudman Commc'ns Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1569 (D.C. Cir. 1987).

The records withheld by the FBI fit squarely within the scope of this exemption.[12]  First, the documents qualify as "inter-agency or intra-agency memorandums or letters" because they are communications of agency officials that were between and among agency officials and not shared outside the agencies.  See Eighth Hardy Decl. ¶¶ 35-37.  Second, the documents all reflect recommendations or express opinions on legal or policy matters related to the DCS-3000 or similar systems.  Id.

---

[12]   The FBI withheld material protected by the deliberative process privilege under Exemption 5 on the following Bates-numbered pages within the representative sample:  DCS-3000 1606-07, 1609, 2889-95, 3494-97, 3523-24, 3543-45, 3569, 3572-73, 5289, and 5493-5501.

The majority of documents withheld on this basis were internal FBI emails dating from October 2005 to October 2006, produced from the computers of employees in the FBI Office of General Counsel.  See Eighth Hardy Decl. ¶ 37; see, e.g., Ex. O at 1607-09, 3523-24, 3569, 3572-73.  As set forth in the materials accompanying the Eighth Declaration of David M. Hardy, these emails contained predecisional discussions of policies, processes, and DCS-3000 systems content, design, collection methods, capabilities and vulnerabilities, and their release would hamper the quality of FBI decisionmaking.  Id. ¶ 37; see, e.g., Ex. O at 1607-09, 3523-24, 3569, 3572-73. This material was "prepared in the context of agency employees' deliberations because they consist of preliminary opinions, evaluations and comments of FBI staff," and release of this information "would chill the full and frank discussion between agency personnel regarding agency decisions" relevant to the DCS-3000 and similar systems.  Eighth Hardy Decl. ¶ 37.

## 2.     The FBI Properly Withheld Information Pursuant to the Attorney-Client Privilege

The attorney-client privilege protects confidential communications made between attorneys and their clients when the communications are made for the purpose of securing legal advice or services.  See In re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984).  A government agency, like a private party, "needs . . . assurance of confidentiality so it will not be deterred from

full and frank communications with its counselors."  In re Lindsey, 148 F.3d 1100, 1105 (D.C. Cir. 1998).  The attorney-client privilege encompasses situations in which an attorney's counsel is sought on a legal matter, and applies both to a client's disclosures to an attorney and an attorney's communications to a client.  See Coastal States, 617 F.2d at 862.  Accordingly, the privilege applies in the context of federal agencies, in which agency clients and agency attorneys

have privileged attorney-client relationships.  See id. at 863.

In the instant case, the FBI properly withheld material protected by the attorney-client privilege pursuant to Exemption 5.[13]  This includes two categories of internal FBI information: (1) FBI internal e-mails; and (2) a draft "Privacy Threshold Analysis."  See Eighth Hardy Decl. ¶ 39 (noting that the majority of the withheld material is contained in FBI internal e-mails).  The internal e-mails at issue were produced from the computers of employees in the FBI Office of General Counsel.  Id.  These e-mails date from February 2006 to August 2006.  See id. at ¶ 40, Ex. O at 3523, 3543-45, 3569, and 3573.  Each entails legal advice given by employees in the Office of General Counsel regarding certain aspects of the DCS-3000.  Id.  The second withheld category—the draft Privacy Threshold Analysis—"was prepared for and contains responses intended for review by the [FBI Office of General Counsel]."  Id. ¶ 41.  This draft document reflects legal advice sought by the FBI and provided by the Office of General Counsel regarding the DCS-3000.  Id.

In sum, the withheld material at issue consists of confidential attorney-client communications involving (1) internal information presented by FBI employees to FBI Office of General Counsel attorneys for consultation regarding the DCS-3000; or (2) the advice of Office of General Counsel attorneys regarding "legal issues presented by the creation and utilization of the DCS-3000."  Id. ¶ 42.  Because this information falls squarely within the attorney-client privilege, Defendant was justified in withholding it from Plaintiff under Exemption 5.

---

[13]  The FBI withheld records protected by the attorney-client privilege under Exemption 5 on the following Bates-numbered pages within the representative sample:  DCS-3000 2889-95, 3523, 3543-45, 3569, and 3573.

**E.    The FBI Properly Withheld Names and Identifying Information of FBI Support Personnel, FBI Special Agents, and Third Parties of Investigative Interest Pursuant to FOIA Exemptions 6 and 7(C)**

The FBI properly withheld personal identifying information of FBI support personnel, FBI special agents, and third parties of investigative interest from portions of documents pursuant to sections 552(b)(6) ("Exemption 6") and/or 7(C) ("Exemption 7(C)") of the FOIA.

Exemptions 6 and 7(C) protect the privacy of individuals from unwarranted invasion. The Supreme Court has adopted a broad construction of the privacy interests protected by these exemptions, rejecting a "cramped notion of personal privacy" and emphasizing that "privacy encompass[es] the individual's control of information concerning his or her person." DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 763 (1989).  Privacy is of particular importance in the FOIA context because a disclosure required by FOIA is a disclosure to the public at large.  See, e.g., Painting & Drywall Work Pres. Fund, Inc. v. HUD, 936 F.2d 1300, 1302 (D.C. Cir. 1991).

**1.    The FBI Properly Withheld Names and Identifying Information Pursuant to FOIA Exemption 6.**

Exemption 6 allows for the withholding of information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); see also Dep't of State v. Washington Post Co., 456 U.S. 595, 599-600 (1982) ("[T]he primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters.").  For this exemption to apply, the information at issue must be maintained in a government file and "appl[y] to a particular individual."  Id. at 602.  Once these threshold requirements are met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's

interest in disclosure.  See Dep't of Defense v. Fed. Labor Relations Auth. (FLRA), 510 U.S.

487, 495 (1994); Reed v. NLRB, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

"The privacy interest protected by Exemption 6 'encompass[es] the individual's control

of information concerning his or her person.'"  FLRA, 510 U.S. at 500 (quoting Reporters

Comm., 489 U.S. at 773).  In contrast, "the only relevant public interest in the [Exemption 6]

balancing analysis [is] the extent to which disclosure of the information sought would 'she[d]

light on an agency's performance of its statutory duties' or otherwise let citizens know 'what

their government is up to.'"  Id. at 495 (quoting Reporters Comm., 489 U.S. at 773) (third

alteration by FLRA Court).

The balancing analysis required by Exemption 6 is similar to that required by Exemption

7(C), which permits withholding of "records or information compiled for law enforcement

purposes . . . to the extent that the production of such law enforcement records or information . . .

*could reasonably be expected* to constitute an unwarranted invasion of personal privacy." 5

U.S.C. § 552(b)(7), (b)(7)(C) (emphasis added).  Case law pertaining to Exemption 7(C) is

therefore germane to the Exemption 6 analysis.  See, e.g., Reed, 927 F.2d at 1251; Barnard v.

Dep't of Homeland Sec., 598 F. Supp. 2d 1, 20 (D.D.C. 2009) (Kollar-Kotelly, J.).  Also, as

discussed in further detail below, see infra section III.E.2, the FBI has asserted Exemption 7(C)

as an additional basis for withholding the material that it withheld under Exemption 6.

a.      Names and/or Identifying Information of FBI Support Personnel
        and Special Agents

The FBI properly applied Exemption 6 to documents that identify FBI support personnel

and Special Agents.[14]  The FBI has done so to protect these individuals "from unnecessary,

unofficial questioning as to their participation in the design, maintenance and use of FBI

computer systems and databases which contain information about current and past

investigations."  Eighth Hardy Decl. ¶ 47.

    The FBI properly applied Exemption 6 to records that identify FBI support personnel,

including staff from the Operational Technology Division ("OTD"), various FBI field offices,

and the Office of General Counsel whose names and identifying information appear in FBI e-

mails and other internal documents at issue in this case.  Id. ¶ 48.  "These employees have access

to information regarding computer systems designs and security, and could become targets of

harassing inquiries for unauthorized access to these systems if their identities were released."  Id.

Such individuals "maintain substantial privacy interests in not having their identities disclosed,"

and there is no public interest to be served by doing so.  Id.  Accordingly, "disclosure of this

information would constitute a clearly unwarranted and unwarranted invasion of their personal

privacy," id., as it is well-established that government officials "'have a legitimate interest in

preserving the secrecy of matters that conceivably could subject them to annoyance or

harassment in either their official or private lives.'"  Lewis-Bey v. DOJ, 595 F. Supp. 2d 120,

---

[14]  The FBI asserted Exemption 6 in withholding names and identifying information of
FBI support personnel and special agents on the following Bates-numbered pages within the
representative sample:  DCS-3000 3-6, 11, 232, 1252, 1386, 1403a, 1403f, 1417, 1455, 1459-60,
1542, 1605-09, 1667, 1713, 1761, 1882-84, 1957, 2033, 2074-78, 2207, 2847, 2889, 2894-95,
3131-32, 3138, 3443, 3459-60, 3494-95, 3519-20, 3523-24, 3543-45, 3569-70, 3572, 4231,
4237, 4239, 4252, 4256, 4259, 4266, 4273, 4280, 4344, 5060-62, 5064, 5067-68, 5080, 5082,
5084-86, 5094, 5103, 5114, 5117, 5133, 5142-43, 5154-56, 5207, 5209-11, 5213-16, 5238, 5277,
5279, 5289, 5490-93, 5496, 5502-03, 5522, 7524-25, 7711-12, 7714-16, 7727-28, 7780, 7792,
7794, 7809-11.  The FBI has invoked Exemption 6 in conjunction with Exemption 7(C) for
much of this information, as discussed in further detail below.  See infra, § III.E.2.

134-35 (D.D.C. 2009) (Kessler, J.) (quoting Lesar v. DOJ, 636 F.2d 472, 487 (D.C. Cir. 1980)).

Accordingly, withholding the specified documents to protect the privacy interests of these

government employees is justified under Exemption 6.

The FBI also properly asserted Exemption 6 as to documents that identify FBI Special

Agents.  "FBI Special Agents were involved in the design of the DCS-3000," and their names

appear in FBI internal e-mails contained in the documents specified in this release.  Eighth

Hardy Decl. ¶ 47.  These agents "conduct official inquiries into various criminal and national

security violation cases," and "the DCS-3000 is one investigatory tool utilized" to fulfill those

duties.  Id.  Because there is no public interest to be served by disclosing the identities of FBI

Special Agents to the public, and the information withheld would not otherwise enlighten the

public on how the FBI conducts its internal operations and investigations, "disclosure of this

information would constitute a clearly unwarranted invasion of their personal privacy."  Id.; see

also FLRA, 510 U.S. at 500.  Accordingly, withholding the specified documents to protect the

privacy interests of these Special Agents is justified under Exemption 6.

        b.      Names and/or Identifying Information of Third Parties of
                Investigative Interest

The FBI also properly withheld information to protect the names and identifying

information of third parties of investigative interest pursuant to Exemption 6.[15]  The material

_____

        [15]  The FBI asserted Exemption 6 in withholding names and identifying information of
third parties of investigative interest on the following Bates-numbered pages within the
representative sample:  DCS-3000 2074-75, 2077-78, 3808, 3811, 3814, 3822-23, 3825,
3845-46, 3854-55, 3864, 3867, 4108-09, 4195, 4197, 4198-4230, 4243, 4245, 4247-51, 4261-62,
4264, 4268-69, 4271, 7528-33, 7535-40, and 7868.  The FBI has also invoked Exemption 7(C) in
conjunction with Exemption 6 for much of this information, as discussed in further detail above.
See supra, § III.E.2.

withheld includes the names, personal information, communications data and other information that could potentially lead to the identification of the third party. See Eighth Hardy Decl. ¶ 49. As explained in the attached Eighth Declaration of David M. Hardy, "being linked with any law enforcement investigation carries a strong negative connotation and a stigma," and public release of the identities of these individuals "could subject them to harassment or embarrassment, as well as undue public attention." Id.

Associating a third party with a criminal or national security investigation can invade that person's privacy and damage his reputation. See, e.g., Reporters Comm., 489 U.S. at 770-71 (concluding that disclosure of an individual's criminal history implicates substantial privacy interests). Individuals have a "strong interest . . . in not being associated unwarrantedly with alleged criminal activity." Fitzgibbon v. CIA, 911 F.2d 755, 767 (D.C. Cir. 1990) (internal quotation marks omitted). Indeed, "an individual whose name surfaces in connection with an investigation may, without more, become the subject of rumor and innuendo." Cong. News Syndicate v. DOJ, 438 F. Supp. 538, 541 (D.D.C. 1977) (Pratt. J.). Those whose names may surface in an FBI investigation, even if they are not targets, have strong personal privacy interests. See Fitzgibbon, 911 F.2d at 767; Quiñon v. FBI, 86 F.3d 1222, 1230 (D.C. Cir. 1996); see also Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995) (portions of law enforcement investigatory records that would reveal the identities of subjects, witnesses, or informants are categorically exempt from disclosure under the FOIA).

Here, the FBI determined that the individuals to whom the information pertains maintain a substantial privacy interest in not having their identities disclosed, and balanced those privacy interests against the public's interest in disclosure. See Eighth Hardy Decl. ¶ 46. The FBI

determined that this third party information withheld would not enlighten the public on how the

FBI conducts its internal operations and investigations, and therefore concluded that the

disclosure of the information would constitute a clearly unwarranted invasion of the third

parties' personal privacy.  See id. ¶¶ 46, 49.  Accordingly, withholding the specified documents

to protect the privacy interests of these third parties is justified under Exemption 6.

In sum, the FBI's withholdings under Exemption 6 were proper.  First, all of the withheld

information in this instance is maintained in government files and "applies to a particular

individual."  Washington Post Co., 456 U.S. at 602; see Eighth Hardy Decl. ¶ 45-49.  Second,

this personal information would not "'she[d] light on [the FBI's] performance of its statutory

duties' or otherwise let citizens know 'what their government is up to.'"  FLRA, 510 U.S. at 495

(quoting Reporters Comm., 489 U.S. at 773); see Eighth Hardy Decl. ¶¶ 46, 47-49.  By contrast,

the individuals to whom the information pertains have "substantial privacy interests in not

having their identities disclosed."  Eighth Hardy Decl. ¶¶ 47-49.  Accordingly, the balance of

interests required by Exemption 6 militates in favor of the withholdings made in this case.

## 2.    The FBI Properly Withheld Law Enforcement Information Pursuant to FOIA Exemption 7(C)

Exemption 7 permits withholding of "records or information compiled for law

enforcement purposes" meeting certain specified criteria.  5 U.S.C. § 552(b)(7).  In assessing

whether records are "compiled for law enforcement purposes," under Exemption 7, "the focus is

on how and under what circumstances the requested files were compiled, and 'whether the files

sought relate to anything that can fairly be characterized as an enforcement proceeding.'"

Jefferson v. DOJ, 284 F.3d 172, 176-77 (D.C. Cir. 2002) (citations omitted).  The range of law

enforcement purposes falling within the scope of Exemption 7 includes government national

security and counterterrorism activities.  See, e.g., Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d

918, 926 (D.C. Cir. 2003); Kidder v. FBI, 517 F. Supp. 2d 17, 27 (D.D.C. 2007) (Walton, J.).

Furthermore, the FBI, as a law enforcement agency, is entitled to deference when it identifies

material as having been compiled for law enforcement purposes under Exemption 7.  See

Campbell v. DOJ, 164 F.3d 20, 32 (D.C. Cir. 1999).

       The records at issue in this litigation were compiled for law enforcement purposes within

the meaning of Exemption 7 because, as explained in the attached Eighth Declaration of David

M. Hardy, the records responsive to the Plaintiff's requests "concern the creation and

implementation of [a] system designed to provide specific investigative data," and the DCS-3000

"is an essential investigatory tool used by FBI personnel."  See Eighth Hardy Decl. ¶ 45.

       As discussed above, see infra § III.E.1., FOIA Exemption 7(C) exempts from disclosure

"records or information compiled for law enforcement purposes . . . to the extent that the

production of such law enforcement records or information . . . could reasonably be expected to

constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7), (b)(7)(C).  If the

records at issue were compiled for law enforcement purposes, Exemption 7(C) requires the

agency to balance the relevant individual privacy rights against the public interest in disclosure.

See Reporters Comm., 489 U.S. at 762; Davis v. DOJ, 968 F.2d 1276, 1281 (D.C. Cir. 1992).

The balancing analysis is similar to the analysis conducted under Exemption 6, but the analysis

under Exemption 7(C) tilts more in favor of nondisclosure.  Reed, 927 F.2d at 1251 (explaining

similarity of Exemption 6 analysis and Exemption 7(C) analysis); Summers v. DOJ, 517 F. Supp.

2d 231, 243 (D.D.C. 2007) (Sullivan, J.) ("While its language is similar to Exemption 6,

Exemption 7(C) places an even lower burden on the agency to justify withholding

information.").

The FBI has asserted Exemption 7(C) in conjunction with Exemption 6 in withholding names and identifying information of FBI support personnel, FBI Special Agents, and third parties of investigative interest.  See infra, § III.E.1.; Eighth Hardy Decl. ¶¶ 44-49.[16]  As explained in the accompanying Eighth Declaration of David M. Hardy, and in the above discussion of Exemption 6, the individuals to whom this information pertains have a substantial privacy interest in preventing disclosure of the information, and such disclosure would not advance any public interest.  See Eighth Hardy Decl. ¶¶ 44-49.  Indeed, the Supreme Court has concluded that "as a categorical matter . . . a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy" and that, in such circumstances, "the privacy interest protected by Exemption 7(C) is in fact at its apex while the FOIA-based public interest in disclosure is at its nadir."  Reporters Comm., 489 U.S. at 780; see also, e.g., Fitzgibbon, 911 F.2d at 767 (acknowledging stigmatic connotations of being mentioned in law enforcement files). Because disclosure of this law enforcement-related

---

[16]  The FBI asserted Exemption 7(C) in withholding names and identifying information of FBI support personnel and Special Agents on the following Bates-numbered pages within the representative sample:  DCS-3000 3-6, 11, 232, 1252, 1386, 1403a, 1403f, 1417, 1455, 1459-60, 1542, 1605-09, 1667, 1713, 1761, 1882-84, 1957, 2033, 2074-78, 2207, 2847, 2889, 2894-95, 3131-32, 3138, 3443, 3459-60, 3494-95, 3519-20, 3523-24, 3543-45, 3569-70, 3572, 4231, 4237, 4239, 4252, 4256, 4259, 4266, 4273, 4280, 4344, 5060-62, 5064, 5067-68, 5080, 5082, 5084-86, 5094, 5103, 5114, 5117, 5133, 5142-43, 5154-56, 5207, 5209-11, 5213-16, 5238, 5277, 5279, 5289, 5490-93, 5496, 5502-03, 5522, 7524-25, 7711-12, 7714-16, 7727-28, 7780, 7792, 7794, 7809-11.
    The FBI asserted Exemption 7(C) in withholding names and identifying information of third parties of investigative interest on the following Bates-numbered pages within the representative sample:  DCS-3000 2074-75, 2077-78, 3808, 3811, 3814, 3822-23, 3825, 3845-46, 3854-55, 3864, 3867, 4108-09, 4195, 4197, 4198-4230, 4243, 4245, 4247-51, 4261-62, 4264, 4268-69, 4271, 7528-33, 7535-40, and 7868.

information could reasonably be expected to constitute an unwarranted invasion of personal

privacy, see Eighth Hardy Decl. ¶¶ 44-49, it is protected under Exemption 7(C).

F.   **The FBI Properly Withheld Data Sources, Data Processes, Systems Design and Computer Application Information Pursuant to FOIA Exemption 7(E)**

The FBI properly withheld DCS-3000 data sources, data processes, systems design and

computer application information pursuant to section 552(b)(7)(E) of the FOIA ("Exemption

7(E)").[17]  Exemption 7(E) permits withholding of information compiled for law enforcement

purposes if release of the information "would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk

circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Congress intended for Exemption 7(E) to

protect from disclosure techniques and procedures used to prevent and protect against crimes, as

well as techniques and procedures used to investigate crimes after their commission.  See, e.g.,

PHE, Inc. v. DOJ, 983 F.2d 248, 250-51 (D.C. Cir. 1993) (holding that portions of FBI manual

describing patterns of violations, investigative techniques, and sources of information available

---

[17]  The FBI invoked Exemption 7(E) in withholding internal data source and processes, systems designs and computer applications on the following Bates-numbered pages within the representative sample:  DCS-3000 3-6, 11, 232, 964, 966, 1198, 1252, 1386, 1417, 1455, 1459-60, 1542, 1605-09, 1667, 1713, 1761, 1882-84, 1957, 2034, 2074-78, 2207, 2846, 2847, 3131-32, 3138, 3443, 3452-53, 3459-60, 3494-96, 3520-24, 3569-70, 3572-73, 3582, 3584, 3586, 3599-3603, 3605-12, 3614, 3621-27, 3628, 3632-33, 3639, 3641-42, 3683-96, 3749-52, 3758-61, 3769-76, 3805-26, 3841-69, 3929-42, 3987-4011, 4087-4122, 4193-4228, 4232, 4241-45, 4247-52, 4254-55, 4257-58, 4261-65, 4268-71, 4274-75, 4277-79, 4281, 4344-49, 4730-35, 4975-77, 5061, 5063, 5069-79, 5087-94, 5104, 5106-09, 5112-13, 5116-31, 5135-42, 5144-48, 5153-54, 5157-5201, 5203, 5208, 5210-12, 5214, 5219-31, 5233-39, 5242, 5244-54, 5256, 5259-67, 5269, 5272-76, 5278, 5280-86,  5489, 5489-95, 5497-5503, 5522, 7524, 7525, 7527-33, 7535-40, 7542-44, 7546-49, 7551-53, 7555, 7711-16, 7721-33, 7779-7801, 7809-17, 7821-24, 7840, 7847, 7859-61, 7863-68, 7871-73, 7875-79, and 7881-88.

to investigators were protected by Exemption 7(E)).

Exemption 7(E) does not require a particular determination of harm that would result from disclosure of specific records or information; rather, the exemption categorically protects information related to law enforcement techniques.  See Smith v. Bureau of Alcohol, Tobacco & Firearms, 977 F. Supp. 496, 501 (D.D.C. 1997) (Friedman, J.) ("Exemption 7(E) provides categorical protection to information related to law enforcement techniques."); Fisher v. DOJ, 772 F. Supp. 7, 12 n.9 (D.D.C. 1991) (Richey, J.), aff'd, 968 F.2d 92 (D.C. Cir. 1992).  Even when the identity of a given technique is generally known, Exemption 7(E) will still apply to protect against disclosure of its details so long as (1) the manner and circumstances of its use are not generally known or (2) the disclosure of the details could reduce the technique's effectiveness.  Blanton v. DOJ, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (Friedman, J.); Coleman v. FBI, 13 F. Supp. 2d 75, 83 (D.D.C. 1998) (Lamberth, J.) (same).

Pursuant to Exemption 7(E), the FBI has withheld:  (1) internal database identifiers; (2) data source information; (3) "computer systems and subsystems identification and descriptions of capabilities, including details about the storage, searching and management and control of data"; (4) external computer interfaces; (5) detailed descriptions of the types of data obtained through utilization of the DCS-3000 and similar systems; and (6) similar or related system names and components.  Id. ¶ 52.  This information is contained in (1) policy, planning, and operations documents; (2) FBI internal e-mails; and (3) other miscellaneous documents.  Eighth Hardy Decl. ¶¶ 51-54.  Non-exhaustive examples of specific entries include DCS-3000 training manuals, security and transition plans, Privacy Threshold Analyses, development materials and charts, tables and other documents "created for the discussion of the capabilities and

vulnerabilities of the DCS-3000."  Id. ¶ 53.

   While it may be generally known that law enforcement agencies can monitor a target electronically using systems such as the DCS-3000, the withheld material contains a level of detail regarding surveillance technology and its use as a law enforcement technique that is not well-known to the public.  See Eighth Hardy Decl. ¶ 53.  As explained above, see supra section III.C.1., and in the accompanying Eighth Declaration of David M. Hardy, public knowledge of these internal procedural documents could enable criminals to employ countermeasures to avoid detection, undermine the effectiveness and integrity of the DCS-3000, and otherwise seriously jeopardize the FBI's investigatory and law enforcement missions.  Eighth Hardy Decl. ¶¶ 32, 54. "Classified data could be released, destroyed or manipulated" if these procedures were made public, and the FBI effectively "would be providing a roadmap on how to evade the detection of illegal activity of an actual or potential criminal or terrorist."  Id. at 54.

   Exemption 7(E) permits the FBI's withholding of this information because it relates to the nature and identity of information sources used in law enforcement and national security activities that, if released, could help criminals evade detection and circumvent the law. Compare id. ¶¶ 53-54, with, e.g., PHE, Inc., 983 F.2d at 251 (holding that Exemption 7(E) authorized withholding of information relating to the "specific documents, records and sources of information available to [FBI] Agents" and concluding that "release of FBI guidelines as to what sources of information are available to its agents might encourage violators to tamper with those sources of information and thus inhibit investigative efforts"), and Tax Analysts v. IRS, 294 F.3d 71, 79 (D.C. Cir. 2002) ("It is clear that, under . . . Exemption 7, an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and

procedures for law enforcement investigations and prosecutions, even when the materials have

not been compiled in the course of a specific investigation.").  Accordingly, because the level of

detail contained in the withheld information is not generally known and because its release

would reduce the effectiveness of the DCS-3000 and could reasonably be expected to risk

circumvention of the law, the information is exempt from disclosure pursuant to Exemption 7(E).

## <u>CONCLUSION</u>

For all the above reasons, the Defendant respectfully requests that the Court grant

summary judgment in favor of the Defendant.

Dated:   August 3, 2009                            Respectfully submitted,

                                                   TONY WEST
                                                   Assistant Attorney General

                                                   CHANNING D. PHILLIPS
                                                   Acting United States Attorney

                                                   ELIZABETH J. SHAPIRO
                                                   Deputy Branch Director

                                                   /s/ Bryan Dearinger
                                                   BRYAN DEARINGER
                                                   (Oregon Bar #061517)
                                                   Trial Attorney
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Avenue, N.W.
                                                   Washington, DC  20530
                                                   Tel: (202) 514-3489
                                                   Fax: (202) 616-8470

                                                   *Attorneys for Defendant*